UNITED STATES *v.* HARRISS ET AL.

No. 32.   Argued October 19, 1953.—Decided June 7, 1954.

*Oscar H. Davis* argued the cause for the United States. With him on the brief were *Robert L. Stern,* then Acting Solicitor General, *Assistant Attorney General Olney, Beatrice Rosenberg* and *John R. Wilkins. Walter J. Cummings, Jr.,* then Solicitor General, filed the Statement as to Jurisdiction.

*Burton K. Wheeler* argued the cause for Harriss, appellee. With him on the brief was *Edward K. Wheeler.*

*Hugh Howell* argued the cause for Linder, Commissioner of Agriculture of Georgia, appellee. With him on the brief was *Victor Davidson.*

Ralph W. Moore, appellee, submitted on brief *pro se.*

Mr. Chief Justice Warren delivered the opinion of the Court.

The appellees were charged by information with violation of the Federal Regulation of Lobbying Act, 60 Stat. 812, 839, 2 U. S. C. §§ 261–270. Relying on its previous

decision in *National Association of Manufacturers* v. *McGrath*, 103 F. Supp. 510, vacated as moot, 344 U. S. 804, the District Court dismissed the information on the ground that the Act is unconstitutional. 109 F. Supp. 641. The case is here on direct appeal under the Criminal Appeals Act, 18 U. S. C. § 3731.

Seven counts of the information are laid under § 305, which requires designated reports to Congress from every person "receiving any contributions or expending any money" for the purpose of influencing the passage or defeat of any legislation by Congress.[1] One such count charges the National Farm Committee, a Texas corpora-

---

[1] Section 305 provides:

"(a) Every person receiving any contributions or expending any money for the purposes designated in subparagraph (a) or (b) of section 307 shall file with the Clerk between the first and tenth day of each calendar quarter, a statement containing complete as of the day next preceding the date of filing—

"(1) the name and address of each person who has made a contribution of $500 or more not mentioned in the preceding report; except that the first report filed pursuant to this title shall contain the name and address of each person who has made any contribution of $500 or more to such person since the effective date of this title;

"(2) the total sum of the contributions made to or for such person during the calendar year and not stated under paragraph (1);

"(3) the total sum of all contributions made to or for such person during the calendar year;

"(4) the name and address of each person to whom an expenditure in one or more items of the aggregate amount or value, within the calendar year, of $10 or more has been made by or on behalf of such person, and the amount, date, and purpose of such expenditure;

"(5) the total sum of all expenditures made by or on behalf of such person during the calendar year and not stated under paragraph (4);

"(6) the total sum of expenditures made by or on behalf of such person during the calendar year.

"(b) The statements required to be filed by subsection (a) shall be cumulative during the calendar year to which they relate, but where

tion, with failure to report the solicitation and receipt of contributions to influence the passage of legislation which would cause a rise in the price of agricultural commodities and commodity futures and the defeat of legislation which would cause a decline in those prices. The remaining six counts under § 305 charge defendants Moore and Harriss with failure to report expenditures having the same single purpose. Some of the alleged expenditures consist of the payment of compensation to others to communicate face-to-face with members of Congress, at public functions and committee hearings, concerning legislation affecting agricultural prices; the other alleged expenditures relate largely to the costs of a campaign to induce various interested groups and individuals to communicate by letter with members of Congress on such legislation.

The other two counts in the information are laid under § 308, which requires any person "who shall engage himself for pay or for any consideration for the purpose of attempting to influence the passage or defeat of any legislation" to register with Congress and to make specified disclosures.[2] These two counts allege in considerable

---

there has been no change in an item reported in a previous statement only the amount need be carried forward."

The following are "the purposes designated in subparagraph (a) or (b) of section 307":

"(a) The passage or defeat of any legislation by the Congress of the United States.

"(b) To influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States."

[2] Section 308 provides:

"(a) Any person who shall engage himself for pay or for any consideration for the purpose of attempting to influence the passage or defeat of any legislation by the Congress of the United States shall, before doing anything in furtherance of such object, register with the Clerk of the House of Representatives and the Secretary of the Senate and shall give to those officers in writing and under

616

detail that defendants Moore and Linder were hired to express certain views to Congress as to agricultural prices or to cause others to do so, for the purpose of attempting to influence the passage of legislation which would cause a rise in the price of agricultural commodities and commodity futures and a defeat of legislation which would cause a decline in such prices; and that pursuant to this undertaking, without having registered as required by

oath, his name and business address, the name and address of the person by whom he is employed, and in whose interest he appears or works, the duration of such employment, how much he is paid and is to receive, by whom he is paid or is to be paid, how much he is to be paid for expenses, and what expenses are to be included. Each such person so registering shall, between the first and tenth day of each calendar quarter, so long as his activity continues, file with the Clerk and Secretary a detailed report under oath of all money received and expended by him during the preceding calendar quarter in carrying on his work; to whom paid; for what purposes; and the names of any papers, periodicals, magazines, or other publications in which he has caused to be published any articles or editorials; and the proposed legislation he is employed to support or oppose. The provisions of this section shall not apply to any person who merely appears before a committee of the Congress of the United States in support of or opposition to legislation; nor to any public official acting in his official capacity; nor in the case of any newspaper or other regularly published periodical (including any individual who owns, publishes, or is employed by any such newspaper or periodical) which in the ordinary course of business publishes news items, editorials, or other comments, or paid advertisements, which directly or indirectly urge the passage or defeat of legislation, if such newspaper, periodical, or individual, engages in no further or other activities in connection with the passage or defeat of such legislation, other than to appear before a committee of the Congress of the United States in support of or in opposition to such legislation.

"(b) All information required to be filed under the provisions of this section with the Clerk of the House of Representatives and the Secretary of the Senate shall be compiled by said Clerk and Secretary, acting jointly, as soon as practicable after the close of the calendar quarter with respect to which such information is filed and shall be printed in the Congressional Record."

§ 308, they arranged to have members of Congress contacted on behalf of these views, either directly by their own emissaries or through an artificially stimulated letter campaign.[3]

We are not concerned here with the sufficiency of the information as a criminal pleading. Our review under the Criminal Appeals Act is limited to a decision on the alleged "invalidity" of the statute on which the information is based.[4]   In making this decision, we judge the statute on its face. See *United States* v. *Petrillo,* 332 U. S. 1, 6, 12.   The "invalidity" of the Lobbying Act is asserted on three grounds: (1) that §§ 305, 307, and 308 are too vague and indefinite to meet the requirements of due process; (2) that §§ 305 and 308 violate the First Amendment guarantees of freedom of speech, freedom of the press, and the right to petition the Government; (3) that the penalty provision of § 310 (b) violates the right of the people under the First Amendment to petition the Government.

## I.

The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.   The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.[5]

---

[3] A third count under § 308 was abated on the death of the defendant against whom the charge was made.

[4] 18 U. S. C. § 3731.   See *United States* v. *Petrillo,* 332 U. S. 1, 5. For "The Government's appeal does not open the whole case." *United States* v. *Borden Co.,* 308 U. S. 188, 193.

[5] See *Jordan* v. *De George,* 341 U. S. 223, 230–232; Quarles, Some Statutory Construction Problems and Approaches in Criminal Law, 3 Vand. L. Rev. 531, 539–543; Note, 62 Harv. L. Rev. 77.

On the other hand, if the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague, even though marginal cases could be put where doubts might arise. *United States* v. *Petrillo,* 332 U. S. 1, 7. Cf. *Jordan* v. *De George,* 341 U. S. 223, 231. And if this general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction. This was the course adopted in *Screws* v. *United States,* 325 U. S. 91, upholding the definiteness of the Civil Rights Act.[6]

The same course is appropriate here. The key section of the Lobbying Act is § 307, entitled "Persons to Whom Applicable." Section 307 provides:

"The provisions of this title shall apply to any person (except a political committee as defined in

---

[6] Cf. *Fox* v. *Washington,* 236 U. S. 273; *Musser* v. *Utah,* 333 U. S. 95; *Winters* v. *New York,* 333 U. S. 507, 510.

This rule as to statutes charged with vagueness is but one aspect of the broader principle that this Court, if fairly possible, must construe congressional enactments so as to avoid a danger of unconstitutionality. *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 407–408; *United States* v. *Congress of Industrial Organizations,* 335 U. S. 106, 120–121; *United States* v. *Rumely,* 345 U. S. 41, 47. Thus, in the *C. I. O.* case, *supra,* this Court held that expenditures by a labor organization for the publication of a weekly periodical urging support for a certain candidate in a forthcoming congressional election were not forbidden by the Federal Corrupt Practices Act, which makes it unlawful for ". . . any labor organization to make a contribution or expenditure in connection with any [congressional] election . . . ." Similarly, in the *Rumely* case, *supra,* this Court construed a House Resolution authorizing investigation of "all lobbying activities intended to influence, encourage, promote, or retard legislation" to cover only " 'lobbying in its commonly accepted sense,' that is, 'representations made directly to the Congress, its members, or its committees.' "

the Federal Corrupt Practices Act, and duly organized State or local committees of a political party), who by himself, or through any agent or employee or other persons in any manner whatsoever, directly or indirectly, solicits, collects, or receives money or any other thing of value to be used principally to aid, or the principal purpose of which person is to aid, in the accomplishment of any of the following purposes:

"(a) The passage or defeat of any legislation by the Congress of the United States.

"(b) To influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States."

This section modifies the substantive provisions of the Act, including § 305 and § 308. In other words, unless a "person" falls within the category established by § 307, the disclosure requirements of § 305 and § 308 are inapplicable.[7] Thus coverage under the Act is limited to those persons (except for the specified political committees) who solicit, collect, or receive contributions of money or other thing of value, and then only if "the principal purpose" of either the persons or the contributions is to aid in the accomplishment of the aims set forth in § 307 (a) and (b). In any event, the solicitation, collection, or receipt of money or other thing of value is a prerequisite to coverage under the Act.

The Government urges a much broader construction—namely, that under § 305 a person must report his expenditures to influence legislation even though he does not solicit, collect, or receive contributions as provided in

---

[7] Section 302 (c) defines the term "person" as including "an individual, partnership, committee, association, corporation, and any other organization or group of persons."

§ 307.[8]  Such a construction, we believe, would do violence to the title and language of § 307 as well as its legislative history.[9]  If the construction urged by the Government is to become law, that is for Congress to accomplish by further legislation.

We now turn to the alleged vagueness of the purposes set forth in § 307 (a) and (b).  As in *United States* v. *Rumely,* 345 U. S. 41, 47, which involved the interpretation of similar language, we believe this language should be construed to refer only to "lobbying in its commonly accepted sense"—to direct communication with members of Congress on pending or proposed federal legislation. The legislative history of the Act makes clear that, at the very least, Congress sought disclosure of such direct pressures, exerted by the lobbyists themselves or through their hirelings or through an artificially stimulated letter campaign.[10]  It is likewise clear that Congress would have

---

[8] The Government's view is based on a variance between the language of § 307 and the language of § 305.  Section 307 refers to any person who "solicits, collects, or receives" contributions; § 305, however, refers not only to "receiving any contributions" but also to "expending any money."  It is apparently the Government's contention that § 307—since it makes no reference to expenditures—is inapplicable to the expenditure provisions of § 305.  Section 307, however, limits the application of § 305 as a whole, not merely a part of it.

[9] Both the Senate and House reports on the bill state that "This section [§ 307] defines the application of the title . . . ."  S. Rep. No. 1400, 79th Cong., 2d Sess., p. 28; Committee Print, July 22, 1946, statement by Representative Monroney on Legislative Reorganization Act of 1946, 79th Cong., 2d Sess., p. 34.  See also the remarks of Representative Dirksen in presenting the bill to the House: "The gist of the antilobbying provision is contained in section 307."  92 Cong. Rec. 10088.

[10] The Lobbying Act was enacted as Title III of the Legislative Reorganization Act of 1946, which was reported to Congress by the Joint Committee on the Organization of Congress.  The Senate and House reports accompanying the bill were identical with respect to

intended the Act to operate on this narrower basis, even if a broader application to organizations seeking to propagandize the general public were not permissible.[11]

There remains for our consideration the meaning of "the principal purpose" and "to be used principally to

Title III. Both declared that the Lobbying Act applies "chiefly to three distinct classes of so-called lobbyists:

"First. Those who do not visit the Capitol but initiate propaganda from all over the country in the form of letters and telegrams, many of which have been based entirely upon misinformation as to facts. This class of persons and organizations will be required under the title, not to cease or curtail their activities in any respect, but merely to disclose the sources of their collections and the methods in which they are disbursed.

"Second. The second class of lobbyists are those who are employed to come to the Capitol under the false impression that they exert some powerful influence over Members of Congress. These individuals spend their time in Washington presumably exerting some mysterious influence with respect to the legislation in which their employers are interested, but carefully conceal from Members of Congress whom they happen to contact the purpose of their presence. The title in no wise prohibits or curtails their activities. It merely requires that they register and disclose the sources and purposes of their employment and the amount of their compensation.

"Third. There is a third class of entirely honest and respectable representatives of business, professional, and philanthropic organizations who come to Washington openly and frankly to express their views for or against legislation, many of whom serve a useful and perfectly legitimate purpose in expressing the views and interpretations of their employers with respect to legislation which concerns them. They will likewise be required to register and state their compensation and the sources of their employment."

S. Rep. No. 1400, 79th Cong., 2d Sess., p. 27; Committee Print, July 22, 1946, statement by Representative Monroney on Legislative Reorganization Act of 1946, 79th Cong., 2d Sess., pp. 32–33. See also the statement in the Senate by Senator La Follette, who was Chairman of the Joint Committee, at 92 Cong. Rec. 6367–6368.

[11] See the Act's separability clause, note 18, *infra,* providing that the invalidity of any application of the Act should not affect the validity of its application "to other persons and circumstances."

aid." The legislative history of the Act indicates that the term "principal" was adopted merely to exclude from the scope of § 307 those contributions and persons having only an "incidental" purpose of influencing legislation.[12] Conversely, the "principal purpose" requirement does not exclude a contribution which in substantial part is to be used to influence legislation through direct communication with Congress or a person whose activities in substantial part are directed to influencing legislation through direct communication with Congress.[13] If it were otherwise—if an organization, for example, were exempted

---

[12] Both the Senate and House reports accompanying the bill state that the Act ". . . does not apply to organizations formed for other purposes whose efforts to influence legislation are merely incidental to the purposes for which formed." S. Rep. No. 1400, 79th Cong., 2d Sess., p. 27; Committee Print, July 22, 1946, statement by Representative Monroney on Legislative Reorganization Act of 1946, 79th Cong., 2d Sess., p. 32. In the Senate discussion preceding enactment, Senator Hawkes asked Senator La Follette, Chairman of the Joint Committee in charge of the bill, for an explanation of the "principal purpose" requirement. In particular, Senator Hawkes sought assurance that multi-purposed organizations like the United States Chamber of Commerce would not be subject to the Act. Senator La Follette refused to give such assurance, stating: "So far as any organizations or individuals are concerned, I will say to the Senator from New Jersey, it will depend on the type and character of activity which they undertake. . . . I cannot tell the Senator whether they will come under the act. It will depend on the type of activity in which they engage, so far as legislation is concerned. . . . *It* [the Act] *affects all individuals and organizations alike if they engage in a covered activity.*" (Italics added.) 92 Cong. Rec. 10151–10152. See also Representative Dirksen's remarks in the House, 92 Cong. Rec. 10088.

[13] Such a criterion is not novel in federal law. See Int. Rev. Code, § 23 (o) (2) (income tax), § 812 (d) (estate tax), and § 1004 (a) (2) (B) (gift tax), providing tax exemption for contributions to charitable and educational organizations "no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation." For illustrative cases applying this criterion, see

because lobbying was only one of its main activities—the Act would in large measure be reduced to a mere exhortation against abuse of the legislative process. In construing the Act narrowly to avoid constitutional doubts, we must also avoid a construction that would seriously impair the effectiveness of the Act in coping with the problem it was designed to alleviate.

To summarize, therefore, there are three prerequisites to coverage under § 307: (1) the "person" must have solicited, collected, or received contributions; (2) one of the main purposes of such "person," or one of the main purposes of such contributions, must have been to influence the passage or defeat of legislation by Congress; (3) the intended method of accomplishing this purpose must have been through direct communication with members of Congress. And since § 307 modifies the substantive provisions of the Act, our construction of § 307 will of necessity also narrow the scope of § 305 and § 308, the substantive provisions underlying the information in this case. Thus § 305 is limited to those persons who are covered by § 307; and when so covered, they must report all contributions and expenditures having the purpose of attempting to influence legislation through direct communication with Congress. Similarly, § 308 is limited to those persons (with the stated exceptions [14]) who are covered by § 307 and who, in addition, engage themselves

---

*Sharpe's Estate* v. *Commissioner,* 148 F. 2d 179 (C. A. 3d Cir.); *Marshall* v. *Commissioner,* 147 F. 2d 75 (C. A. 2d Cir.); *Faulkner* v. *Commissioner,* 112 F. 2d 987 (C. A. 1st Cir.); *Huntington National Bank* v. *Commissioner,* 13 T. C. 760, 769. Cf. *Girard Trust Co.* v. *Commissioner,* 122 F. 2d 108 (C. A. 3d Cir.); *Leubuscher* v. *Commissioner,* 54 F. 2d 998 (C. A. 2d Cir.); *Weyl* v. *Commissioner,* 48 F. 2d 811 (C. A. 2d Cir.); *Slee* v. *Commissioner,* 42 F. 2d 184 (C. A. 2d Cir.). See also Annotation, 138 A. L. R. 456.

[14] For the three exceptions, see note 2, *supra.*

for pay or for any other valuable consideration for the purpose of attempting to influence legislation through direct communication with Congress. Construed in this way, the Lobbying Act meets the constitutional requirement of definiteness.[15]

---

[15] Under this construction, the Act is at least as definite as many other criminal statutes which this Court has upheld against a charge of vagueness. *E. g., Boyce Motor Lines* v. *United States,* 342 U. S. 337 (regulation providing that drivers of motor vehicles carrying explosives "shall avoid, so far as practicable, and, where feasible, by prearrangement of routes, driving into or through congested thoroughfares, places where crowds are assembled, street car tracks, tunnels, viaducts, and dangerous crossings"); *Dennis* v. *United States,* 341 U. S. 494 (Smith Act making it unlawful for any person to conspire "to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence . . . ."); *United States* v. *Petrillo,* 332 U. S. 1 (statute forbidding coercion of radio stations to employ persons "in excess of the number of employees needed . . . to perform actual services"); *Screws* v. *United States,* 325 U. S. 91, and *Williams* v. *United States,* 341 U. S. 97 (statute forbidding acts which would deprive a person of "any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States"); *United States* v. *Wurzbach,* 280 U. S. 396 (statute forbidding any candidate for Congress or any officer or employee of the United States to solicit or receive a "contribution for any political purpose whatever" from any other such officer or employee); *Omaechevarria* v. *Idaho,* 246 U. S. 343 (statute forbidding pasturing of sheep "on any cattle range previously occupied by cattle, or upon any range usually occupied by any cattle grower"); *Fox* v. *Washington,* 236 U. S. 273 (state statute imposing criminal sanctions on "Every person who shall wilfully print, publish, edit, issue, or knowingly circulate, sell, distribute or display any book, paper, document, or written or printed matter, in any form, advocating, encouraging or inciting, or having a tendency to encourage or incite the commission of any crime, breach of the peace or act of violence, or which shall tend to encourage or advocate disrespect for law or for any court or courts of justice . . . ."); *Nash* v. *United States,* 229 U. S. 373 (Sherman Act forbidding "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint

## II.

Thus construed, §§ 305 and 308 also do not violate the freedoms guaranteed by the First Amendment—freedom to speak, publish, and petition the Government.

Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent.[16]

Toward that end, Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much. It acted in the same spirit and for a similar purpose in passing the Federal Corrupt Practices Act—to maintain the integrity of a basic governmental process. See *Burroughs and Cannon* v. *United States,* 290 U. S. 534, 545.

Under these circumstances, we believe that Congress, at least within the bounds of the Act as we have construed it, is not constitutionally forbidden to require the disclosure of lobbying activities. To do so would be to deny Congress in large measure the power of self-protec-

---

of trade or commerce among the several States, or with foreign nations"). Cf. *Jordan* v. *De George,* 341 U. S. 223 (statute providing for deportation of persons who have committed crimes involving "moral turpitude").

[16] Similar legislation has been enacted in over twenty states. See Notes, 56 Yale L. J. 304, 313–316, and 47 Col. L. Rev. 98, 99–103.

tion. And here Congress has used that power in a manner restricted to its appropriate end. We conclude that §§ 305 and 308, as applied to persons defined in § 307, do not offend the First Amendment.

It is suggested, however, that the Lobbying Act, with respect to persons other than those defined in § 307, may as a practical matter act as a deterrent to their exercise of First Amendment rights. Hypothetical borderline situations are conjured up in which such persons choose to remain silent because of fear of possible prosecution for failure to comply with the Act. Our narrow construction of the Act, precluding as it does reasonable fears, is calculated to avoid such restraint. But, even assuming some such deterrent effect, the restraint is at most an indirect one resulting from self-censorship, comparable in many ways to the restraint resulting from criminal libel laws.[17] The hazard of such restraint is too remote to require striking down a statute which on its face is otherwise plainly within the area of congressional power and is designed to safeguard a vital national interest.

### III.

The appellees further attack the statute on the ground that the penalty provided in § 310 (b) is unconstitutional. That section provides:

> "(b) In addition to the penalties provided for in subsection (a), any person convicted of the misdemeanor specified therein is prohibited, for a period of three years from the date of such conviction, from attempting to influence, directly or indirectly, the passage or defeat of any proposed legislation or from

---

[17] Similarly, the Hatch Act probably deters some federal employees from political activity permitted by that statute, but yet was sustained because of the national interest in a nonpolitical civil service. *United Public Workers* v. *Mitchell*, 330 U. S. 75.

appearing before a committee of the Congress in support of or opposition to proposed legislation; and any person who violates any provision of this subsection shall, upon conviction thereof, be guilty of a felony, and shall be punished by a fine of not more than $10,000, or imprisonment for not more than five years, or by both such fine and imprisonment."

This section, the appellees argue, is a patent violation of the First Amendment guarantees of freedom of speech and the right to petition the Government.

We find it unnecessary to pass on this contention. Unlike §§ 305, 307, and 308 which we have judged on their face, § 310 (b) has not yet been applied to the appellees, and it will never be so applied if the appellees are found innocent of the charges against them. See *United States* v. *Wurzbach,* 280 U. S. 396, 399; *United States* v. *Petrillo,* 332 U. S. 1, 9–12.

Moreover, the Act provides for the separability of any provision found invalid.[18] If § 310 (b) should ultimately be declared unconstitutional, its elimination would still leave a statute defining specific duties and providing a specific penalty for violation of any such duty. The prohibition of § 310 (b) is expressly stated to be "In addition to the penalties provided for in subsection (a) . . ."; subsection (a) makes a violation of § 305 or § 308 a misdemeanor, punishable by fine or imprisonment or both. Consequently, there would seem to be no obstacle to giving effect to the separability clause as to § 310 (b), if this should ever prove necessary. Compare *Electric Bond & Share Co.* v. *Securities & Exchange Commission,* 303 U. S. 419, 433–437.

---

[18] 60 Stat. 812, 814:

"If any provision of this Act or the application thereof to any person or circumstances is held invalid, the validity of the remainder of the Act and of the application of such provision to other persons and circumstances shall not be affected thereby."

The judgment below is reversed and the cause is remanded to the District Court for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

I am in sympathy with the effort of the Court to save this statute from the charge that it is so vague and indefinite as to be unconstitutional. My inclinations were that way at the end of the oral argument. But further study changed my mind. I am now convinced that the formula adopted to save this Act is too dangerous for use. It can easily ensnare people who have done no more than exercise their constitutional rights of speech, assembly, and press.

We deal here with the validity of a criminal statute. To use the test of *Connally* v. *General Construction Co.,* 269 U. S. 385, 391, the question is whether this statute "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." If it is so vague, as I think this one is, then it fails to meet the standards required by due process of law. See *United States* v. *Petrillo,* 332 U. S. 1. In determining that question we consider the statute on its face. As stated in *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453:

> "If on its face the challenged provision is repugnant to the due process clause, specification of details of the offense intended to be charged would not serve to validate it. . . . It is the statute, not the accusa-

> tion under it, that prescribes the rule to govern conduct and warns against transgression. . . . No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids."

And see *Winters* v. *New York,* 333 U. S. 507, 515.

The question therefore is not what the information charges nor what the proof might be. It is whether the statute itself is sufficiently narrow and precise as to give fair warning.

It is contended that the Act plainly applies

> —to persons who pay others to present views to Congress either in committee hearings or by letters or other communications to Congress or Congressmen and

> —to persons who spend money to induce others to communicate with Congress.

The Court adopts that view, with one minor limitation which the Court places on the Act—that only persons who solicit, collect, or receive money are included.

The difficulty is that the Act has to be rewritten and words actually added and subtracted to produce that result.

Section 307 makes the Act applicable to anyone who "directly or indirectly" solicits, collects, or receives contributions "to be used principally to aid, or the principal purpose of which person is to aid" in either

> —the "passage or defeat of any legislation" by Congress, or

> —"To influence, directly or indirectly, the passage or defeat of any legislation" by Congress.

We start with an all-inclusive definition of "legislation" contained in § 302 (e). It means "bills, resolutions, amendments, nominations, and other matters

pending or proposed in either House of Congress, and includes any other matter which may be the subject of action by either House." What is the scope of "any other matter which may be the subject of action" by Congress? It would seem to include not only pending or proposed legislation but any matter within the legitimate domain of Congress.

What contributions might be used "principally to aid" in influencing "directly or indirectly, the passage or defeat" of any such measure by Congress? When is one retained for the purpose of influencing the "passage or defeat of any legislation"?

(1) One who addresses a trade union for repeal of a labor law certainly hopes to influence legislation.

(2) So does a manufacturers' association which runs ads in newspapers for a sales tax.

(3) So does a farm group which undertakes to raise money for an educational program to be conducted in newspapers, magazines, and on radio and television, showing the need for revision of our attitude on world trade.

(4) So does a group of oil companies which puts agents in the Nation's capital to sound the alarm at hostile legislation, to exert influence on Congressmen to defeat it, to work on the Hill for the passage of laws favorable to the oil interests.

(5) So does a business, labor, farm, religious, social, racial, or other group which raises money to contact people with the request that they write their Congressman to get a law repealed or modified, to get a proposed law passed, or themselves to propose a law.

Are all of these activities covered by the Act? If one is included why are not the others? The Court apparently excludes the kind of activities listed in categories (1), (2), and (3) and includes part of the activities in (4) and (5)—those which entail contacts with the Congress.

There is, however, difficulty in that course, a difficulty which seems to me to be insuperable.  I find no warrant in the Act for drawing the line, as the Court does, between "direct communication with Congress" and other pressures on Congress.  The Act is as much concerned with one as with the other.

The words "direct communication with Congress" are not in the Act.  Congress was concerned with the raising of money to aid in the passage or defeat of legislation, whatever tactics were used.  But the Court not only strikes out one whole group of activities—to influence "indirectly"—but substitutes a new concept for the remaining group—to influence "directly."  To influence "directly" the passage or defeat of legislation includes any number of methods—for example, nationwide radio, television or advertising programs promoting a particular measure, as well as the "buttonholing" of Congressmen.  To include the latter while excluding the former is to rewrite the Act.

This is not a case where one or more distinct types of "lobbying" are specifically proscribed and another and different group defined in such loose, broad terms as to make its definition vague and uncertain.  Here if we give the words of the Act their ordinary meaning, we do not know what the terminal points are.  Judging from the words Congress used, one type of activity which I have enumerated is as much proscribed as another.

The importance of the problem is emphasized by reason of the fact that this legislation is in the domain of the First Amendment.  That Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people . . . to petition the Government for a redress of grievances."

Can Congress require one to register before he writes an article, makes a speech, files an advertisement, appears

on radio or television, or writes a letter seeking to influence existing, pending, or proposed legislation? That would pose a considerable question under the First Amendment, as *Thomas* v. *Collins,* 323 U. S. 516, indicates. I do not mean to intimate that Congress is without power to require disclosure of the real principals behind those who come to Congress (or get others to do so) and speak as though they represent the public interest, when in fact they are undisclosed agents of special groups. I mention the First Amendment to emphasize why statutes touching this field should be "narrowly drawn to prevent the supposed evil" (see *Cantwell* v. *Connecticut,* 310 U. S. 296, 307) and not be cast in such vague and indefinite terms as to cast a cloud on the exercise of constitutional rights. Cf. *Stromberg* v. *California,* 283 U. S. 359, 369; *Thornhill* v. *Alabama,* 310 U. S. 88, 97–98; *Winters* v. *New York,* 333 U. S. 507, 509; *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 504–505.

If that rule were relaxed, if Congress could impose registration requirements on the exercise of First Amendment rights, saving to the courts the salvage of the good from the bad, and meanwhile causing all who might possibly be covered to act at their peril, the law would in practical effect be a deterrent to the exercise of First Amendment rights. The Court seeks to avoid that consequence by construing the law narrowly as applying only to those who are paid to "buttonhole" Congressmen or who collect and expend moneys to get others to do so. It may be appropriate in some cases to read a statute with the gloss a court has placed on it in order to save it from the charge of vagueness. See *Fox* v. *Washington,* 236 U. S. 273, 277. But I do not think that course is appropriate here.

The language of the Act is so broad that one who writes a letter or makes a speech or publishes an article

or distributes literature or does many of the other things with which appellees are charged has no fair notice when he is close to the prohibited line. No construction we give it today will make clear retroactively the vague standards that confronted appellees when they did the acts now charged against them as criminal. Cf. *Pierce* v. *United States*, 314 U. S. 306, 311. Since the Act touches on the exercise of First Amendment rights, and is not narrowly drawn to meet precise evils, its vagueness has some of the evils of a continuous and effective restraint.

MR. JUSTICE JACKSON, dissenting.

Several reasons lead me to withhold my assent from this decision.

The clearest feature of this case is that it begins with an Act so mischievously vague that the Government charged with its enforcement does not understand it, for some of its important assumptions are rejected by the Court's interpretation. The clearest feature of the Court's decision is that it leaves the country under an Act which is not much like any Act passed by Congress. Of course, when such a question is before us, it is easy to differ as to whether it is more appropriate to strike out or to strike down. But I recall few cases in which the Court has gone so far in rewriting an Act.

The Act passed by Congress would appear to apply to all persons who (1) solicit or receive funds for the purpose of lobbying, (2) receive and expend funds for the purpose of lobbying, or (3) merely expend funds for the purpose of lobbying. The Court at least eliminates this last category from coverage of the Act, though I should suppose that more serious evils affecting the public interest are to be found in the way lobbyists spend their money than in the ways they obtain it. In the present indictments, six counts relate exclusively to failures to

report expenditures while only one appears to rest exclusively on failure to report receipts.

Also, Congress enacted a statute to reach the raising and spending of funds for the purpose of influencing congressional action *directly or indirectly*. The Court entirely deletes "indirectly" and narrows "directly" to mean "direct communication with members of Congress." These two constructions leave the Act touching only a part of the practices Congress deemed sinister.

Finally, as if to compensate for its deletions from the Act, the Court expands the phrase "the principal purpose" so that it now refers to any contribution which "in substantial part" is used to influence legislation.

I agree, of course, that we should make liberal interpretations to save legislative Acts, including penal statutes which punish conduct traditionally recognized as morally "wrong." Whoever kidnaps, steals, kills, or commits similar acts of violence upon another is bound to know that he is inviting retribution by society, and many of the statutes which define these long-established crimes are traditionally and perhaps necessarily vague. But we are dealing with a novel offense that has no established bounds and no such moral basis. The criminality of the conduct dealt with here depends entirely upon a purpose to influence legislation. Though there may be many abuses in pursuit of this purpose, this Act does not deal with corruption. These defendants, for example, are indicted for failing to report their activities in raising and spending money to influence legislation in support of farm prices, with no charge of corruption, bribery, deception, or other improper action. This may be a selfish business and against the best interests of the nation as a whole, but it is in an area where legal penalties should be applied only by formulae as precise and clear as our language will permit.

The First Amendment forbids Congress to abridge the right of the people "to petition the Government for a redress of grievances." If this right is to have an interpretation consistent with that given to other First Amendment rights, it confers a large immunity upon activities of persons, organizations, groups and classes to obtain what they think is due them from government. Of course, their conflicting claims and propaganda are confusing, annoying and at times, no doubt, deceiving and corrupting. But we may not forget that our constitutional system is to allow the greatest freedom of access to Congress, so that the people may press for their selfish interests, with Congress acting as arbiter of their demands and conflicts.

In matters of this nature, it does not seem wise to leave the scope of a criminal Act, close to impinging on the right of petition, dependent upon judicial construction for its limitations. Judicial construction, constitutional or statutory, always is subject to hazards of judicial reconstruction. One may rely on today's narrow interpretation only at his peril, for some later Court may expand the Act to include, in accordance with its terms, what today the Court excludes. This recently happened with the anti-trust laws, which the Court cites as being similarly vague. This Court, in a criminal case, sustained an indictment by admittedly changing repeated and long-established constitutional and statutory interpretations. *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533. The *ex post facto* provision of our Constitution has not been held to protect the citizen against a retroactive change in decisional law, but it does against such a prejudicial change in legislation. As long as this statute stands on the books, its vagueness will be a contingent threat to activities which the Court today rules out, the contingency being a change of views by the Court as hereafter constituted.

The Court's opinion presupposes, and I do not disagree, that Congress has power to regulate lobbying for hire as a business or profession and to require such agents to disclose their principals, their activities, and their receipts.  However, to reach the real evils of lobbying without cutting into the constitutional right of petition is a difficult and delicate task for which the Court's action today gives little guidance.  I am in doubt whether the Act as construed does not permit applications which would abridge the right of petition, for which clear, safe and workable channels must be maintained.  I think we should point out the defects and limitations which condemn this Act so clearly that the Court cannot sustain it as written, and leave its rewriting to Congress.  After all, it is Congress that should know from experience both the good in the right of petition and the evils of professional lobbying.