The METROPOLITAN GOVERNMENT
OF NASHVILLE AND DAVIDSON
COUNTY et al., Appellants,

v.

Elizabeth Ann MARTIN, d/b/a Classic
Cat II, Appellees.

Supreme Court of Tennessee.

July 2, 1979.

Rehearing Denied Aug. 6, 1979.

J. R. Slobey, Metropolitan Atty., Nashville, for appellants.

R. Price Nimmo, Joel H. Moseley, Richardson R. Lynn, Nashville, for appellees.

## OPINION

HENRY, Chief Justice.

The Metropolitan Beer Permit Board of Nashville and Davidson County suspended the beer permit of Classic Cat II, pursuant to two citations. The Davidson County Circuit Court, pursuant to statutory writs of certiorari and a` de novo hearing as provided in Sec. 57–209, T.C.A., reversed. The two writs were consolidated for trial purposes in the Circuit Court.

We examine these citations and the proceedings conducted pursuant thereto.

### I.

#### The First Citation

When a petition for certiorari is filed to review the action of a beer board in revoking or suspending a beer license, Sec. 57–209, T.C.A. requires that "the revoking agency shall cause to be made, certified and forwarded to said court a complete transcript of the proceedings in said cause."

The certificate lodged in the Circuit Court does not even purport to transmit a copy of the citation. There appears as Exhibit A to the petition for certiorari an undated document alleged in the petition and admitted in the answer to be a copy of the charges filed against the owner of the Classic Cat II. There is no indication it was ever served. In summary it charges violations as follow:

1. Metropolitan Code Section 5–1–23 relating to false statements in the permit application.

2. Metropolitan Code Section 5–1–16(a) requiring written applications.

3. Metropolitan Code Section 5–1–16(a)(6) requiring a statement that the applicant will conduct the business in person, and an indication of agency.

4. Metropolitan Code Section 5–1–16(d) providing for a forfeiture of a permit as a consequence of false statements in the application.

Permittee was cited to appear before the Beer Board on April 10, 1978 to answer these charges.

The Beer Board also lodged with the Circuit Court an authenticated copy of the transcript of its April 10, 1978 session. At the commencement of the hearing before the Beer Board, the Metropolitan Attorney, at the request of the Chairman, read the charges. The charges, as read, may be summarized as follows:

1. Violating Metropolitan Code Section 5–1–18.1 declaring beer premises to be public places for purposes of inspection.

2. Violating Metropolitan Code Section 5–2–23.3 making it unlawful to allow intoxicated persons to loiter on or about premises.

After these two charges, which are not contained in the citation as purportedly issued, there follows a specification charging the refusal to permit a police officer to enter the establishment and another charging the arrest of a drunk found on the premises and of the club manager for "allowing drunks to loiter."

Thereafter the charges, as read, contain the four charges hereinabove listed. There

is no indication that the citation was amended or that notice was ever given to the permittee of the additional charges.

At the hearing proof was presented as to these various charges.

Quite aside from the flawed foundation upon which these charges rested from a procedural standpoint, we find the proof to be wholly inadequate to support them. The Beer Board suspended the "license" for sixty (60) days. We assume that the Board intended to suspend the permit since it is powerless to suspend the license, although the latter is ineffectual without a permit.

After all the proof was in and a motion was made to suspend the license for sixty (60) days, Metropolitan counsel pointed out the necessity that the Board particularize its findings. The Board thereupon announced that it was "based on the beer violation." We surmise that the Board intended by this to find the permittee guilty of all charges except those relating to false statements in the application. This necessarily follows from the fact that the latter violation requires a forfeiture of the permit.

Appeals to this Court in cases involving beer permits are accompanied by a presumption of the correctness of the action of the trial court, unless the evidence preponderates against it. *Lones v. Blount County Beer Board*, 538 S.W.2d 386 (Tenn.1976). The preponderance of the evidence clearly supports the Trial Judge's finding of insufficient evidence to support this particular suspension. His action is affirmed and appellants' assignments I and III are overruled.

## II.

### The Second Citation

The second citation was properly certified by the Beer Board and is included in the record. It charges the permittee with allowing "an[y] intoxicated person to loiter on or about the premises," on April *14*, 1978.

All the proof was directed to activities occurring on April *16*, 1978; however, counsel makes no issue of this discrepancy. Therefore, we do not treat it as being of critical significance. It is but another of many instances of sloppy Beer Board procedure.

The proof presented to the Beer Board was meager and marginal. If there were no other proof in the record we unhesitatingly would affirm the Trial Judge and hold that the Beer Board acted arbitrarily; however, upon the *de novo* hearing before the Trial Judge additional proof was presented which places the matter in an entirely different light.

The presentation of additional proof before the Trial Judge is permissible under Sec. 57–209, T.C.A., which provides for a trial *de novo*. In this context this means that the cause is tried as if it originated in the Circuit or Chancery Court and the Trial Judge is required to make an independent judgment on the merits, substituting his or her judgment for that of the Beer Board. *Richards v. Lewisburg Alcoholic Beverage Commission*, 543 S.W.2d 852 (Tenn.1977). As aforesaid, the finding of the Trial Court is supported by a presumption of correctness and will not be disturbed unless it preponderates against the conclusion reached.

We find that the evidence so preponderates.

Before the Trial Court the Beer Board presented the deposition of the "loitering drunk" and his cohort and companion. This proof was not presented to the Beer Board.[1]

He is a member of the regular army stationed at Fort Campbell. He and his

---

1. This proof was in deposition form. Neither deposition was signed by the deponent. Neither deposition waived the signature and neither authorized the signature by another. Rule 30.05, Tenn.R.Civ.P. requires that the deposition be submitted to the witness for examination and be signed by him unless waived or unless the witness is ill or cannot be found or refuses to sign. The record contains no indication of any of these conditions. A motion to suppress may be made for ɪailure to abide the rule and the deposition may be rejected. No motion to suppress was made. Rule 32.04 provides that such irregularities are waived in the absence of such a motion. We, therefore, have considered these two depositions.

companion, another soldier, arrived in Nashville in the early afternoon of April 16, 1978 and took a room at a local motel.

About mid-afternoon they wended their way to the Classic Cat II, where they stayed several hours imbibing seven and sevens,[2] "[m]aybe 10 to 15." Thereafter, they left, bought a bottle of Seagrams V.O. and settled down to some serious drinking—"drinking out of the bottle."

Around 9:30 or 10:00 p. m. they returned to the Classic Cat and the seven and sevens. While he denies that his first 10–15 drinks caused him to be "smashed," he admits that after his interlude with Seagrams V.O. and after topping that off with more seven and sevens, he was drunk.

He says that every time he drinks "hard liquor" he gets drunk or tries to. He admits that he was in Nashville to get "bombed," and that he went to the Classic Cat to get drunk and "watch the women." Of course, he denies that he has a drinking problem; he says he just likes to drink.

They apparently remained at the Classic Cat for some two or three hours on their second visit.

When we analyze this soldier's actions in terms of his stated intention "to get bombed," the conclusion is inevitable that success crowned his efforts. While he lolled, loafed, and loitered about the Classic Cat satisfying his lickerish craving for liquor by lapping up lavish libations, he fell from his chair, clutching his drink in his hand, into the waiting hands of vice squad officer McElhaney, who helped him up and took him to jail.

We subject his conduct to the most liberal standard that has come to the attention of the author of this opinion.

> Not drunk is he who from the floor
> Can rise alone and still drink more;
> But drunk is he, who prostrate lies,
> Without the power to drink or rise.[3]

This soldier fails the test. He was drunk—openly, visibly, notoriously, gloriously and uproariously drunk.

The Classic Cat II violated one of the great commandments by which "beer joints" must live. In summary and in short, in paraphrase and in idiom, the law "don't allow no [drunken] hanging around" beer establishments.

We do not deal with an isolated case of a drunk who came in from the cold and was drunk on arrival, or with a customer who consumed beer and became intoxicated as a result of that consumption under circumstances where the management reasonably could not be expected to realize that the customer had reached the point of intoxication. We deal purely and simply with permitting a drunk to "hang around" a beer joint under circumstances that were known, or should have been known to the permittee, or her employees.

We find no reported cases wherein the courts have attempted to define the offense of drunken loitering about premises where beer was sold. However, *Hopper v. State*, 194 Tenn. 600, 253 S.W.2d 765 (1952) deals with an analogous prohibition against permitting minors to loiter about such premises. There, this Court quoted with approval the definition of "loitering" as contained in a decision of the Connecticut Supreme Court:

> To be slow in moving; to delay; to linger; to be dilatory; to spend time idly; to saunter; to lag behind. 194 Tenn. at 601, 253 S.W.2d at 766.

*See also McCoy v. State*, 3 Tenn.Cr.App. 709, 466 S.W.2d 540 (1971) where the Court approved a definition from Black's Law Dictionary:

> To be dilatory, to be slow in movement, to stand around, to spend time idly, to saunter, to delay, to idle, to linger, to lag behind. 466 S.W.2d at 542.

We approve these definitions; they accord with the common understanding of the term "loiter" or "loitering."

Appellants' assignment number IV is sustained and the action of the Beer Board in

---

2. Seagrams and 7-up.

3. Thomas L. Peacock, The Misfortunes of Elphin (1827) Translated from the Welsh.

suspending Classic Cat II's license for a period of thirty (30) days is upheld.

## III.

 Appellants assign as error the Trial Court's ruling that Metropolitan Code Section 5–1–23(k), which makes it unlawful to permit an intoxicated person to loiter on or about premises where beer is sold, is unconstitutionally vague.

It is well settled that municipalities, in the exercise of their police power, are given wide discretion in regulating the sale of intoxicating beverages. *Barnes v. Dayton*, 216 Tenn. 400, 392 S.W.2d 813 (1965); *Estrin v. Moss*, 221 Tenn. 657, 430 S.W.2d 345 (1968), *appeal dismissed* 393 U.S. 318, 89 S.Ct. 554, 21 L.Ed.2d 513 (1969).

Although an ordinance must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989, 996 (1954), the United States Supreme Court has stated that laws governing regulated activities are not subject to the same degree of scrutiny as laws applicable to the general population:

> In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed. . . .
>
> The poor among us, the minorities, the average householder are not in business and not alerted to the regulatory schemes of vagrancy laws; and we assume they would have no understanding of their meaning and impact if they read them. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162–63, 92 S.Ct. 839, 843, 31 L.Ed.2d 110, 115–16 (1972).

The ordinance in question applies only to beer permit holders and their employees. The sale of beer is a regulated business in which the permit holders are cognizant of the regulatory scheme and aware of its impact.

As noted above, the definition of "loiter" approved in previous cases reflects the common understanding of the term. We therefore hold that in the context of this regulatory scheme, the ordinance is not unconstitutionally vague, under either the state or federal constitution.

This cause is remanded to the Circuit Court at Nashville for appropriate action as to the 30-day suspension of the permit of the Classic Cat II.

Affirmed in part; reversed in part; remanded.

FONES, COOPER, BROCK and HARBISON, JJ., concurring.

## MEMORANDUM ON PETITION TO REHEAR

The petition to rehear is respectfully denied. The evidence, in its totality, clearly preponderates against the correctness of the action of the trial court. *Lones v. Blount County Beer Board*, 538 S.W.2d 386 (Tenn.1976).

All concur.