■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SAUL KAGAN, Appellant. THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JEAN WOLF, Appellant. THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TORLEAF BENESTAD, Appellant. — Judgment, Supreme Court, New York County (Fraiman, J., after jury trial and verdict), rendered January 7, 1980, convicting defendants-appellants of numerous counts of misapplication of bank funds (Banking Law, § 673) and conspiracy in the third degree (former Penal Law, § 105.05) and imposing various monetary fines, affirmed. The central legal issue on this appeal involves the interpretation of the words "wilfully misapplies" in section 673 of the Banking Law, which makes it a felony for a bank officer or employee to willfully misapply any of the bank's "money, funds or property *** or *** its *** credit." In *People v Marcus* (261 NY 268, 278), the Court of Appeals declared it to be a violation of the predecessor section "for a director knowingly to use the assets of his corporation for other than corporate purposes or proper and legitimate investment, even though he had no intention of cheating or defrauding anybody." As amplified in Judge Lehman's partial dissenting opinion, the court held in *Marcus* (pp 298-299): "Though the motives of the officers in disregarding such obligations may not be corrupt; though no injury may come to any party from such disregard, a willful — that is, an intentional — violation of these obligations is visited under the law with severe penalties, and no director or officer who disregards such obligations can legitimately complain when the courts enforce according to their letter the provisions of law enacted for the protection of the public." Although the precise issue presented here was not before the court in *Marcus,* we think it consistent with the holding in that decision and its accompanying analysis, as well as in accordance with the clear meaning of the statutory language, that a violation occurs when bank officials knowingly apply bank money or credit in a manner explicitly prohibited by statutory provisions clearly designed to protect and conserve such funds and credit from risk of loss. The evidence here was more than sufficient to sustain the jury's verdict convicting the defendants of various counts alleging a violation of section 673. Indeed, although the precise question was not presented to the jury, as it appears not to have been presented in *Marcus,* the evidence abundantly establishes that the defendants, senior officers of the American Bank & Trust Company, knowingly used the bank's assets, in a systematic and repetitive way, "for other than corporate purposes or proper and legitimate investment." Nor does it have any legal significance that the defendants did not profit directly from any of the illegal transactions. If the intention to benefit personally were relevant, which it is not, the conclusion is inescapable that the

defendants' actions, in violation of their fiduciary and legal obligations, were motivated by a desire to accommodate the interests and needs of the bank's new owner, a purpose which surely concerns intimately their private interests. We have examined the other issues raised on this appeal and find them to be without substantial merit. We agree that the use by the prosecutor of a previous cease and desist order is open to question, but this error, if it was an error, seems to us insufficient to warrant reversal of a judgment entered after a very extended trial in the face of the unmistakable import of the totality of the evidence. Concur — Birns, Sandler, Sullivan and Carro, JJ.

Kupferman, J. P., dissents in a memorandum as follows: I would reverse, on the law and as a matter of discretion in the interest of justice, and dismiss the indictments for each of the three defendants to this appeal. Defendants Kagan and Wolf appeal from judgments (Fraiman, J.), rendered on January 7, 1980 after a jury trial on various charges of bank fraud under the felony provisions of section 673 of the Banking Law and of conspiracy in the third degree under former section 105.05 of the Penal Law. Defendant Benestad pleaded guilty to three counts of violating section 673 of the Banking Law, but, with the People's consent, preserved for this appeal the issue of whether a larcenous intent is a necessary element of a charge of misappropriation of bank funds under section 673 of the Banking Law. Defendant Kagan was fined a total of $40,000, $5,000 each on eight of the counts of which the jury had found him guilty; on his other 25 convictions, the court discharged him unconditionally. Defendant Wolf was fined $5,000 on each of four counts, a total of $20,000, and was given unconditional discharges on his remaining five convictions. Defendant Benestad, who was also convicted on his plea of guilty on January 7, 1980 (Fraiman, J.), received three $5,000 fines totaling $15,000. Kagan has paid his fines. The fines of Wolf and Benestad have been stayed by this court pending appeal. This case involves a series of transactions allegedly amounting to illegal loans in violation of subdivisions 1 and 8 of section 103 and sections 106 and 673 of the Banking Law, through several credit devices. The transactions at issue were carried out by various officers at the American Bank and Trust Company (ABT), a New York chartered commercial bank, in the period from December 26, 1975 to August 6, 1976, for the benefit of a correspondent bank, Banque Pour L'Amerique du Sud (BAS) and another affiliate, Banker's International (BI), both banks controlled by the Graiver family. The prosecution implies that these improper transactions, technical violations of civil law and regulations, precipitated the failure of ABT, which in 1975 had assets of some $270 million. ABT was taken over by Bank Leumi in September, 1976. Following the takeover, the New York County District Attorney's office began an investigation which led to an 85-count indictment of defendants Kagan, Wolf, Benestad and Fleckenstein. BAS, a Belgian bank, was owned by the Graiver family. BI was also controlled by the Graivers. The Graivers were a prominent Argentinian banking family which owned several other foreign domiciled banks in addition to BAS and BI. The Graivers had recently purchased the Century National Bank and was in the process of securing the approval of the New York Banking Department for the purchase of ABT. David Graiver came onto the board of directors of ABT's parent holding company in June, 1975. On March 25, 1976, he was elected to ABT's board. At ABT he was also a member of the board's executive and finance committees. In July, 1975, BAS opened its account with ABT. BAS' initial $400,000 line of credit was later increased by the executive committee of the ABT board to $2.2 million. Because this account was of a foreign bank, it was located in ABT's international division, which was headed by defendant Wolf who oversaw the operation of all such foreign accounts. Defendant Kagan, chairman of the board's executive committee and the second ranking officer of ABT, had supervisory responsibilities

for this division. Defendant Benestad, a director of both ABT and its parent, and a senior executive vice-president of ABT, supervised the treasury division. Defendant Fleckenstein, who was indicted but never went to trial due to a serious illness, was the bank's treasurer. The conspiracy charge alleged that defendants agreed to willful misapplication of funds and credit of ABT by approving, authorizing, directing and assisting ABT in making loans to various entities controlled by David Graiver. In carrying out this conspiracy, defendants allegedly violated three civil regulatory provisions of the Banking Law: (a) Subdivision 1 of section 103 limits the amount a bank may lend to a single unsecured borrower to 10% of its capital, surplus and undivided profits or 25% if the borrowing is secured. During the period of the alleged conspiracy these limit amounts were approximately $2.6 million and $6.5 million, respectively. It was alleged that ABT made unsecured loans to BAS in excess of the 10% limit. (b) Subdivision 8 of section 103 limits lending to any directors or any director-controlled entities to an amount approved by the lending bank's board. ABT's approved amount was $2.2 million. It was alleged that ABT made loans to BAS, a Graiver controlled entity, in excess of this amount. (c) Section 106 limits the amount one bank may deposit in a bank designated as a depository bank under certain conditions; namely, 10% of the depositing bank's capital stock, surplus funds and undivided profits may be deposited in any depository bank, up to 25% may be deposited if a majority of the directors of the depositing bank designates the depository bank as such, and up to 200% may be so deposited if, in addition to a majority board vote, there is approval by the Superintendent of Banks, and the intended depository bank is a New York bank. It was alleged that ABT deposited its funds with BAS in excess of the 10% limitation. These civil regulations were allegedly violated by several banking devices, such as "month-end" and time deposits, the purchase of foreign checks, overdrafts, and grants of immediate credit on domestic checks, and sales of Federal funds. These transactions had the effect of aiding a number of Graiver entities. By July, 1976, the situation was such that defendant Wolf and a former bank examiner visited BAS offices in Belgium to review that bank's liquidity problems and assess its management capability. Upon their return and their report to ABT president Kreitman, Kreitman discussed these borrowing problems personally with David Graiver who promised that within a week he would come up with sufficient funds to right all accounts and devise a plan to eliminate borrowing from ABT. Two days later, August 6, 1976, David Graiver supposedly was killed in a plane crash over Mexico. There have been reported sightings of him since the date of the crash. He was thus named as a defendant but not arraigned. In 1979, when the trial court severed Fleckenstein's case, it also dismissed the indictments as to defendant Graiver, with leave to the People to resubmit or move for reconsideration in the event of new developments indicating that Graiver was in fact alive. It is well to note here that the deposits allegedly exceeding the 10% deposit limit, of which there were three according to the indictment, were repaid the next business day. Each overdraft alleged in the indictment was repaid with interest. All checks were collected which were the subject of check purchases, a device by which immediate credit is given prior to collection. The only count of the indictment allegedly in violation of section 673 of the Banking Law which did not also violate one of the afore-mentioned civil regulations, was based on a letter, signed by Kagan and dated March 30, 1976, offering to purchase seven listed loans from BAS. This, claimed the People, constituted a misapplication of ABT credit, since ABT allegedly received no compensation for said letter. Nonetheless, this offer was never accepted and, therefore, there could be no misapplication of credit. There was even evidence at trial that there was some compensation for this proposed accommodation.

ABT at no time suffered a loss of funds due to the transactions at issue. Nor did the People ever establish or even allege that any of these defendants on appeal ever received any personal gain from their activities or even stood to gain anything from any of the transactions at issue. Each contends he acted in good faith relying on long-standing banking practices and policies. By all indications, it appears these defendants did act in good faith. With the exception of the count against Kagan based on the March 30, 1976 letter, the People tried the case on the theory that all alleged violations of civil regulations were violations of section 673 of the Banking Law, which denominates as a felony the willful misapplication of funds or credit of a bank by any of its officers, directors or employees. The statute also provides that "Nothing in this section shall be deemed or construed to repeal, amend or impair any existing provision of law prescribing a punishment for any such offense." In a pretrial motion the remaining three defendants challenged the counts alleging violations of section 673 of the Banking Law. All contend that the felony of misapplication of bank funds defined by section 673 requires intent to injure or defraud the bank, although that element is not specified in the statute. The trial court denied that motion on the authority of *People v Marcus* (261 NY 268) and ruled that it was only necessary to prove a knowing act in violation of sections 103 and 106 and unnecessary to prove an intent to injure or harm the bank. In view of this ruling by the court defendant Benestad pleaded guilty to three counts but preserved the "intent" issue. Although the majority of this court may conclude that *Marcus* forecloses the issue, I cannot agree. We need not reach the *Marcus* question. Defendants also challenge on appeal the "piggybacking" of penal sanctions onto violations of civil regulatory statutes and argue that sections 103 and 106 of the Banking Law have been unconstitutionally applied. This is so because the civil regulatory provisions do not place a violator on notice that he/she will be subjected to felony penalties thereby. This argument has validity. There is nothing in the civil regulations which would connect those provisions to the penal provisions. Neither section 103 nor 106 makes any reference to section 673, and there is no reference in 673 to the civil regulations. It is a fundamental due process requirement that a criminal statute give "'a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute'" *(Papachristou v City of Jacksonville,* 405 US 156, 162; *United States v Harriss,* 347 US 612, 617). *People v Caswell-Massey Co.* (6 NY2d 497, 501) holds that "a clear and positive expression of legislative intent" is necessary to make violations of *malum prohibitum* statutes a criminal act. In New York, at least, one other attempted piggyback theory of prosecution was also held to be unconstitutional. *(People v Colozzo,* 54 Misc 2d 687, affd 32 AD2d 927.) In fact, a close reading of the civil regulations reveals that the Legislature provided monetary penalties for certain violations of section 103, including subdivision 8 of that section, giving an indication that where the Legislature intended penalties, it made clear provision for them. The only other penalty provisions which could be logically connected to those sections not containing specific monetary sanctions are those imposed by catch-all misdemeanor provisions of section 665 of the Banking Law (of doubtful validity considering *People v Collozzo, supra),* or the catch-all administrative provisions of section 41 of the Banking Law. Significant in this discussion of piggybacking is a recent decision in the Fifth Circuit involving the analogous Federal misapplication statute (US Code, tit 18, § 656; *United States v Christo,* 614 F2d 486). Christo was criminally prosecuted under that statute for violations of civil regulatory provisions when he honored overdrafts of credit-worthy customers. The court noted that, "It is undisputed that overdrafting by bank 'insiders' is a common practice within the banking industry." *(United States v Christo, supra,* p 489.) Relying on

*United States v Britton* (107 US 655), that court stated that "bank funds are not criminally misapplied merely because they are applied in a manner unauthorized or prohibited by the Federal banking statutes". *(United States v Christo, supra,* p 490.) Specifically, the court condemned the Government's attempt to bootstrap civil regulatory violations into misapplication felonies and reversed the conviction. Defendants' arguments that "willful misapplication" requires the element of specific criminal intent to injure or defraud the bank, has merit as well, and *People v Marcus (supra),* is distinguishable. In *Marcus,* the Court of Appeals first took note that the New York penal statute, section 305, predecessor of section 673 of the Banking Law, did not have the crucial phrase "'with intent to injure or defraud'", which was contained in the analogous Federal statute, then determined it had no right or power to read that intent into the statute. But what the court went on to declare was that "[g]ood intentions do not justify the misapplication or misuse of corporate assets when the directors know that the use they are making of them is not for the benefit of the company, *but for the use and benefit of other enterprises in which they are interested*" (emphasis added; *People v Marcus, supra,* p 278). Thus, it may seem that the court did not disclaim the intent element in all cases, but only in a situation where the result of a knowing misapplication was to the defendants' own self-interest. Some time after *Marcus* was decided, the Federal statute was rewritten, and that specific phrase requiring intent was dropped from the revised statute, section 656 of title 18 of the United States Code. Despite the omission of these words, the Federal circuits have continued to require specific criminal intent. *(United States v Docherty,* 468 F2d 989.) To the extent that *Marcus* is read otherwise, it cannot be good law. It is undisputed that these defendants received no personal gain from the alleged violations. Without instructions to the jury that this specific criminal intent must be found, the convictions should be reversed. Other errors in the conduct of the trial, in any event, require a reversal and a new trial. Under subdivision 1 of section 103 of the Banking Law, the 10% restriction for loans is increased to 25% if those loans are secured with collateral. There was sufficient evidence submitted on this issue to create a factual issue which should have been resolved by the jury. So, too, the issue of whether the funds deposited in BAS could be termed "depository accounts" to come under the exemptions of section 106 was a factual question to be resolved by the jury. It is interesting in this regard that ABT president Kreitman testified that BAS was not a depository but stated at another point during the trial that he did not know what was meant by the word depository. A cease and desist order issued by the Banking Department, which did not relate to the transactions at trial was improperly used by the prosecution. Such orders are in the nature of a complaint and are issued by the superintendent when it appears that a bank is "conducting business in an unsafe or unauthorized manner" (Banking Law, § 39, subd 2). Although the superintendent never rescinded the order, a Banking Department memo which came into the possession of the prosecution acknowledged that ABT's contentions in the matter were "accurate statements of law". Despite this exoneration, and despite the fact that the defense offered to stipulate to the order, the People insisted upon its use at trial to maximize the probative value of the order on the issue of knowledge of the limitations of subdivision 1 of section 103 of the Banking Law. The subsequent use of this order at trial was prejudicial and should not be condoned. (See *United States v Christo, supra,* p 495.) The prosecution of this case seems to me to have been ill-advised. It is a situation where it appears that the principal culpable party for any manipulative practices was the supposedly deceased financier. The People chose to prosecute three long-time bank officials who carried on the business of the bank plainly under direction, but who themselves had engaged in no inten-

tional wrongdoing and received no benefit. These were defendants with clean records and credible backgrounds who, it seems, became scapegoats in this tangled affair.