NEW JERSEY STATE CHAMBER OF COMMERCE, *ET AL*, PLAINTIFFS, v. NEW JERSEY ELECTION LAW EN- FORCEMENT COMMISSION, *ET AL*, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided July 1, 1975.

538

Messrs. Wilentz, Goldman & Spitzer for plaintiffs (Mr. Robert N. Wilentz, appearing).

Mr. Edward J. Farrell for defendant New Jersey Election Law Enforcement Commission.

Mr. William F. Hyland, Esq., Attorney General of New Jersey (Mr. Richard M. Conley, Deputy Attorney General appearing).

Messrs. Fuerst & Singer, attorneys for defendant-intervenor Common Cause (Kenneth J. Guido, Jr. and Mr. William S. Singer, appearing).

KIMMELMAN, J. S. C. The constitutionality of certain disclosure and reporting requirements of the New Jersey Campaign Contributions and Expenditures Reporting Act, *L.* 1973, *c.* 83, § 1 *et seq.,* effective April 24, 1973, *N. J. S. A.* 19:44A-1 *et seq.,* which are imposed upon those who would seek to influence or otherwise affect the legislative process are here under attack. While admitting a valid state interest in the need or desirability for legislators to know the identity of those who would influence them and the amounts of money thereby spent, plaintiffs, numbering among them the State Chamber of Commerce, major trade associations, commercial and labor organizations and other civic groups, nevertheless contend that such provisions are unconstitutional because of facial overbreadth and infringement upon the right of free speech.

Apart from the dollar limitations imposed upon spending by candidates for public office and the disclosure and reporting requirements imposed upon them and upon state, county and municipal committees of recognized political parties, the act further requires that any group of "two or more persons acting jointly, or any corporation, partnership, or any other incorporated or unincorporated association * * * which seeks to influence the content, introduction, passage or defeat of legislation" (such group being defined and hereinafter referred to as a "political information organization"), *N. J. S. A.* 19:44A-3(g), to appoint a treasurer and designate a depository (bank) before receiving any contribution or expending any money to influence the legislative process, *N. J. S. A.* 19:44A-13; to receive and expend funds only "through the duly appointed treasurer" *N. J. S. A.* 19:44A-14; to make and file with the Election Law Enforcement Commission "a full report * * * of *all* moneys * * * contributed to it and *all* expenditures made * * * by it" to seek to influence the legislative process, *N. J. S. A.* 19:44A-8, 16, and also to "file with the Election Law Enforcement Commission not later than March 1 of each year, an annual report of *all* moneys * * * contributed to it and *all* expenditures * * * by it, whether or not such expenditures were made * * * to seek to influence" the legislative process. *N. J. S. A.* 19:44A-8. (All emphases provided).

The act in similar fashion regulates "political committees," defined as "any two or more persons acting jointly, or any corporation, partnership or other incorporated or unincorporated association which is organized to, or does, aid or promote the nomination, election or defeat of any candidate or candidates for public office, or which is organized to, or does aid or promote the passage or defeat of a public question in any election." *N. J. S. A.* 19:44A-3(i), *N. J. S. A.* 19:44A-10. Political information organizations and political committees under the legislative scheme have over-

lapping definitions, except with respect to influencing the legislative process, which is confined to the former. Compare § 3(g) with § 3(i).

Individual persons, not acting in concert with any other person or group, may expend personally from their own funds a sum not to exceed $100 exclusive of traveling expenses, to support or defeat a candidate or to aid the passage or defeat of a public question, *N. J. S. A.* 19:44A–11, or to provide political information on any candidate or public question, or to seek to influence the legislative process. *N. J. S. A.* 19:44A–14. Expenditures by individuals above the $100 level require reporting to the Election Law Enforcement Commission. Groups of two or more persons acting together are neither allowed the $100 leeway nor the traveling expense exclusion but must comply with the act before engaging in political activity requiring the expenditure of money.

Nowhere in the act is there contained any threshold level of contributions to be received or expenditures to be made by a political information organization or political committee before there is triggered into effect the requirements to appoint a treasurer and a depository, to receive and expend only through such agencies and to report in detail to the Election Law Enforcement Commission. To those groups the act applies immediately. The only significant monetary exemption is the permission to exclude from the disclosure reports the names of those contributors whose contributions did not exceed $100 during the reporting period, although the aggregate amount of such $100 or lesser contributions must be reported. *N. J. S. A.* 19:44A–8.

Thus, it would appear from the express statutory wording that any corporation, any partnership and any association of two or more persons who spend as little as $1 to provide political information (press releases, pamphlets, newsletters, advertisements, flyers, etc., *N. J. S. A.* 19:44A–3(h)), about candidates or any public question, or make

any similarly slight and insignificant expenditure for travel, postage stamps, stationery, telephone charges and the like in an attempt to arouse public support or in direct contact with legislators to influence the content, introduction, passage or defeat of legislation, are subject to regulation by the act. As noted, individuals, acting alone, who engage in the identical activity but spend $100 or less are completely exempted. In addition, these groups of two or more persons must, with respect to contributions received by them and presumably with respect to their own funds, put the same in the hands of their designated treasurer who, in turn, must run the same through their designated bank depository before spending the funds on political activity. *N. J. S. A.* 19 :44A–15. Noncompliance with the requirements of the act may result in the assessment of substantial penalties. *N. J. S. A.* 19 :44A–22.

Subsequent to the commencement of this litigation the Election Law Enforcement Commission adopted regulations exempting political information organizations and political committees from the reporting and other requirements of the act if the total amount of their expenditures did not exceed $100 during the applicable calendar year or election period. *N. J. A. C.* 19 :25–1.7, 4.7, 12.1; 6 *N. J. R.* 371 *et seq.* (September 25, 1974). On behalf of defendants it is urged that the adoption of these regulations is within the permissible regulatory scope of the Election Law Enforcement Commission, to implement the provisions of the act. *N. J. S. A.* 19 :44A–6(b). On the other hand, plaintiffs claim that the alleged constitutional infirmities inherent in the act cannot be cured by regulations which clearly contravene the act by purporting to limit the direct and explicit statutory wording contained in § 8, which requires the reporting of *all* contributions received and *all* expenditures made. Upon an appeal taken as of right pursuant to *R.* 2 :2–3(a) to review the validity of these regulations promulgated by the Election Law Enforcement Commission, the

Appellate Division, by order dated January 8, 1975, remanded plaintiffs' appeal to this court for consideration of the validity of the regulations in the context of the overall challenge to the constitutionality of the act.

The manifest objective of the New Jersey Campaign and Expenditures Reporting Act is to identify and attempt to regulate the significant flow of substantial wealth aimed at affecting the outcome of elections, public questions and the legislative process. No one doubts that money is a prime lubricant of the machinery of politics. For too many years the financial aspect of politics has been shrouded either in a veil of secrecy or a fog of confusion. The average voter is aware of the tremendous cost involved in running even a modest campaign for elective office; however, he cannot help but wonder where the money comes from and more importantly . . . why it comes. So, too, the legislator is entitled to know much the same information with respect to the motivating forces behind the legislative bills coming before him. See the Legislative Activities Disclosure Act, *L.* 1964, *c.* 207, *N. J. S. A.* 52:13C–1 *et seq.* Surely an informed electorate as well as an informed legislature constitute the essence of a democratic society. Hence the public policy behind the enactment of the act.

The identity of the source of these funds and the recipients of the same when expended, including the regulatory controls to insure accurate reporting thereof, necessarily involves an incidental effect and burden upon the unfettered freedom of political expression guaranteed by both the First Amendment to the U. S. Constitution and *N. J. Const.* (1947), Art. 1, par. 18, which provides:

> The people have the right to freely assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for the redress of grievances.

While there appears no intent, express or implied, in the act to control the content of speech, the broad sweep of the

act's application would necessarily precondition the right of groups to incur expenditures for political expression or spend money in order to disseminate their views (written words) unless and until the group first appointed a treasurer, designated a bank depository and filed notice of the same with the Election Law Enforcement Commission. *N. J. S. A.* 19:44A–10; *N. J. S. A.* 19:44A–13.

Thus, the issue for decision in this case involves a balancing of competing interests between the First Amendment rights of citizens to freely band together, in corporate form or otherwise, and express their political views concerning candidates, public questions and the content, introduction, passage or defeat of legislation, with the countervailing legislative objectives behind the New Jersey Campaign Contributions and Expenditures Reporting Act. Of course, these legislative objectives do not forbid such right of expression. The point is whether the legislative mechanics designed to obtain these goals will tend to deter, stifle, chill or otherwise obstruct and impair such guaranteed rights to a degree which is constitutionally impermissible. In this perspective it is the duty of the courts to determine which of these two conflicting interest demands the greater protection under the particular circumstances presented. *N. A. A. C. P. v. Alabama,* 357 *U. S.* 449, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958); *Gibson v. Florida Investigation Committee,* 372 *U. S.* 539, 83 S. Ct. 889, 9 L. Ed. 2d 929 (1963); *United States v. O'Brien,* 391 *U. S.* 367, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968); *Younger v. Harris,* 401 *U. S.* 37, 91 S. Ct. 746, 27 L. Ed. 669 (1971); *Broadrick v. Oklahoma,* 413 *U. S.* 601, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973); *Anderson v. Sills,* 56 *N. J.* 210, 226–227 (1970).

Although facial overbreadth challenges to the constitutionality of a statute might properly be regarded as involving purely a consideration of applicable legal principles, the lack of any factual trial record was thought in *Anderson v. Sills, supra* at 215 to be inadequate and improper for a de-

cision on the merits by a reviewing court. Accordingly, testimony and voluminous exhibits were received and reviewed by this court.

Several experienced state legislators, past and present, related their views as to the operation of the act. Their concern was not at all with well-organized and adequately financed public information organizations and political committees, such as the New Jersey State Chamber of Commerce for whom the act might not have a substantial deterrent effect. Rather, they were concerned with the so-called single issue groups or *ad hoc* committees which spontaneously spring up to voice their special interest on specific bills before the Legislature. These less organized groups, often just husband and wife or neighborhood teams, constitute a very typical vehicle for political expression throughout the country and New Jersey. In fact, informal political cooperation is a most distinctive characteristic of the American public. Group action is at the heart of the political process. In contrast to the well-organized lobbyist-type group, these less organized political groups probably never heard of the New Jersey Campaign Contributions and Expenditures Reporting Act and could not understand that their activities, because they worked in groups of two or more, were covered.

For example, the well-meaning groups who charter a bus and descend upon the state capitol to campaign for or against abortion laws, or for a state income tax, or for aid to parochial schools, or the state employees who assemble in a group carrying placards for higher wages, or the motorcycle group seeking permission to travel on the Garden State Parkway, all of whom incur expenditures in varying amounts to voice their opinions on these subjects, are unknowing violators of the act. They all have failed to appoint a treasurer, they have failed to designate a bank depository, they have failed to notify the Election Law Enforcement Commission of their spontaneous association to meet what seems to them

to be a pressing public issue, and they have incurred expenditures before complying with the act as aforesaid, thereby subjecting themselves to substantial civil penalties. Far from being a parade of horribles envisioned by defendants, the court finds these modes of political expression most characteristic of New Jersey political life.

The testimony uniformly conveyed the view based upon practical political experience over the years that these typical single-issue, less organized groups, upon learning that the act applied to them, would undoubtedly be inhibited or discouraged from engaging in the activity described. Some groups would have difficulty in finding one of their number to serve as treasurer, or even to find one competent to accept that statutory responsibility, and would therefore simply become disgusted and give up the contemplated activity because it would be too much trouble to comply. As one legislator put it, he welcomed hearing from all groups but was afraid that the reporting requirements of the act would have some deterrence on their activity. He doubted whether any of the *ad hoc* single-issue groups kept any kind of records sufficient to comply with the act. From the myriad of reporting forms utilized by the Election Law Enforcement Commission, it would appear that compliance with the paper work alone would impose a substantial if not onerous burden on these smaller groups.

As an initial proposition, plaintiffs here, while voicing great inconvenience with having to operate under the act, do not claim to have been "chilled" or silenced to any noticeable degree, and therefore some question has been raised as to their standing to sue. Our courts have effectively disposed of that argument in *Anderson v. Sills, supra,* as follows:

We do not require that injury shall be experienced as a condition for suit, * * * and there is good reason to permit the strong to speak for the weak or the timid in First Amendment matters. [at 220]

Recently, in *Broadrick v. Oklahoma, supra,* the United States Supreme Court said:

It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society * * *. As a corollary, the Court has altered its traditional rules of standing to permit — in the First Amendment area — 'attacks on overly broad statutes with no requirements that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite specificity.' *Dombrowski v. Pfister,* 380 *U. S.* [479], 486, 85 S. Ct. [1116], 1121, 14 L. Ed. 2d 22 (1965). Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the Court to refrain from constitutionally protected speech or expression. [413 *U. S.* at 611–612, 93 S. Ct. at 2915–2916]

With respect to the "balancing test" to be undertaken on an assertion of facial overbreadth, *Broadrick* declared:

Such claims of facial overbreadth have been entertained in cases involving statutes which, by their terms, seek to regulate 'only spoken words.' *Gooding v. Wilson,* 405 *U. S.* 518, 520, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972). See *Cohen v. California,* 403 *U. S.* 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) ; *Street v. New York,* 394 *U. S.* 576, 89 S. Ct. 1354, 22 L. Ed. 2d 572 (1969) ; *Brandenburg v. Ohio,* 395 *U. S.* 444, 89 S. Ct. 1827, 23 L. Ed. 430 (1969) ; *Chaplinsky v. New Hampshire,* 315 *U. S.* 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). In such cases, it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes. *Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations.* See *Keyishian v. Board of Regents,* 385 *U. S.* 589, 87 S. Ct. 675, 17 L. Ed. 2d 629 (1967) ; *United States v. Robel,* 389 *U. S.* 258, 88 S. Ct. 419, 19 L. Ed. 2d 508 (1967) ; *Aptheker v. Secretary of State,* 378 *U. S.* 500, 84 S. Ct. 1659, 12 L. Ed. 2d 992 (1964) ; *Shelton v. Tucker,* [364 *U. S.* 479, 81 S. Ct. 247, 5 L. Ed. 2d 231 (1960)]. Facial overbreadth claims have also been entertained where statutes, by their terms, purport to regulate the time, place and manner of

expressive or communicative conduct (citations omitted), and where such conduct has required official approval of the laws that delegated standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights. (citations omitted). [413 *U. S.* at 612–613, 93 S. Ct. at 2916, (emphasis supplied)]

Finally, the *Broadrick* court indicated that the consequence of an overbroad statute is either a limiting construction or partial invalidation by saying:

The consequence of our departure from traditional rules of standing [namely, allowing persons to assert the constitutional rights of third persons when dealing with statutes whose effect fell within the locus of the First Amendment] in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression. Application of the overbreadth doctrine in this manner is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute. [at 613, 93 S. Ct. at 2916]

The good which the act proposes to accomplish must be weighed against the danger which it generates in restraining our citizens from fully expressing their political views. That danger cannot be tolerated, for it threatens the very structure upon which our form of government rests. The act's defect, therefore, lies not in its goal but in the overbreadth employed to achieve it. There can be little doubt that the purification of the legislative process and the daylight which the act seeks to focus upon the flow of money used to affect the legislative process will have a serious dampening effect upon the outflow of spontaneous expression from the typical single-issue, unstructured political group. The factual evidence outlined above, even though conjectural to a degree, indicates as much. Upon close analysis of the act, the state interest pales and becomes quite incompatible with the exercise of First Amendment rights.

For one thing, individuals are freely allowed to expend up to $100, with an unlimited travel exclusion, when engaging in activity described within the purview of political information organizations and political committees. Yet, once that same individual combines with his spouse or neighbor to do the very same thing he is forbidden to do so under pain of civil penalty unless first a treasurer and bank depository are appointed and notice thereof filed, all funds must first be run through the bank before being spent, and a later report of *all* contributions and *all* expenditures must be filed which must list even those expenditures made for entirely legitimate business purposes unrelated to the political process. That the act would freely allow less than $100 political activity on the part of individuals while denying the same freedom to groups of two or more points to a clear clash with the time-honored democratic process of group action. No rational basis for this distinction between one person and two persons as being related to any compelling state interest can be made to appear. Contrary to the provisions of *N. J. Const.* (1947), Art. I, par. 18, the operation of the act would clearly impede people from freely assembling and from freely making known their opinions to their representatives. In fact, spontaneity of expression by any group would effectively be squelched. The act has preconditioned these rights and hence has made them much less than "free."

██ The regulations adopted by the Election Law Enforcement Commission during the pendency of this litigation would place political information organizations and political committees on a par with individuals who do not spend more than $100. Unfortunately, these regulations contradict the plain terms of the act and are out of harmony with it. The act subjects political information organizations and political committees to compliance with respect to *all* contributions and *all* expenditures, *N. J. S. A.* 19:44A–8, 16, and not merely with respect to the second $100 thereof. An administrative regulation may not narrow or restrict the scope of

an otherwise specific and clearly worded statute. *Abelson's Inc. v. N. J. Bd. of Optometrists,* 5 *N. J.* 412 (1950). These regulations purport to do just that and hence are void.

██ Judicial surgery, sometimes permissible when statutory language is susceptible to flexion, may not be performed here to save the political information organization and political committee provisions of the New Jersey Campaign Contributions and Expenditures Reporting Act from constitutional excision. *See Borough of Collingswood v. Ringgold,* 66 *N. J.* 350, 357 (1975); *United States v. Harriss,* 347 *U. S.* 612, 74 S. Ct. 808, 98 L. Ed. 989 (1954). The act is too precisely worded to enable this court to insert into its terms a judicial definition of what should be regarded as a significant flow of money sufficient in amount to influence the legislative process, or to judicially establish a threshold amount which must be reached before the reporting requirements are triggered. In addition, some funds should be able to be spent immediately on seemingly urgent political activity without having to first clear the same through a special bank account. Moreover, much may be said to differentiate between the typical single-issue, unstructured political group which springs into being at any time and at all times, and recedes with the same facility, from the well-organized and well-financed special interest groups. Involved, however, is a legislative function beyond the expertise of this court. The creative power to fashion legislation or alter the structure of government is denied to the judiciary. *Reilly v. Ozzard,* 33 *N. J.* 529, 553 (1960).

██ Elimination of all provisions in the Campaign Contributions and Expenditures Reporting Act relating to political information organizations and political committees and confining the act to the object expressed in its title, see *N. J. Const.* (1947) Art. IV, § 7, cl. 4, will leave intact those provisions relating to candidates, limitations on amounts spent for public office and political party committees. The severability section, *N. J. S. A.* 19:44A–25, will be given full effect.