155 N.J. Super. 218 (1977)
382 A.2d 670
NEW JERSEY STATE CHAMBER OF COMMERCE, A NON-PROFIT NEW JERSEY CORPORATION, ET AL., PLAINTIFFS-RESPONDENTS,
v.
NEW JERSEY ELECTION LAW ENFORCEMENT COMMISSION, AN AGENCY OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 1977.
Decided December 20, 1977.
*220 Before Judges CONFORD, MICHELS and PRESSLER.
Mr. Edward J. Farrell argued the cause for defendant-appellant New Jersey Election Law Enforcement Commission.
Mrs. Erminie L. Conley, Deputy Attorney General, argued the cause for Mr. William F. Hyland, Attorney General of New Jersey.
Mr. William S. Singer argued the cause for defendant-appellant Common Cause (Messrs. Fuerst, Singer and Jacob, attorneys).
Mr. Robert N. Wilentz argued the cause for plaintiffs-respondents (Messrs. Wilentz, Goldman & Spitzer, attorneys; Messrs. Marvin J. Brauth and Alan M. Darnell, on the brief).
*221 The opinion of the court was delivered by CONFORD, P.J.A.D.
The substantial question presented on this appeal is the constitutionality, from a freedom of expression standpoint, of those provisions of L. 1973, c. 83, the New Jersey Campaign Contributions and Expenditures Reporting Act (N.J.S.A. 19:44A-1 et seq.) ("reporting act" hereinafter), which impose public reporting obligations on "political information organizations."[1] Such organizations are defined by the act as "any two or more persons acting jointly * * * which is organized for the purpose of, or which promotes political information concerning any candidate or candidates for public office or with respect to any public question, or which seeks to influence the content, introduction, passage or defeat of legislation" (emphasis supplied).
The gravamen of the trial court holding in this case was that certain groups having the purpose indicated by the language italicized above would be exposed to an impermissibly chilling effect in respect of First Amendment freedoms if subject to compliance with the requirements of the reporting act. Therefore those provisions were held facially invalid notwithstanding it was conceded that the State had a compelling public interest in adopting such legislation and that it would not have been invalid as applied to any of the plaintiff organizations in this case. N.J. Chamber of Commerce v. N.J. Elec. Law Enforcement Comm'n, 135 N.J. Super. 537, 544, 549-550 (Ch. Div. 1975).
The reporting act regulates disclosures concerning elections as well as lobbying, but the instant case involves only the latter aspect of the statute. Political information organizations, defined as above stated, are required to appoint *222 a treasurer and designate a depository before receiving contributions or expending money to influence the legislative process. N.J.S.A. 19:44A-13. Funds must be received and expended through the treasurer, N.J.S.A. 19:44A-14, and reports are required to be filed with the Election Law Enforcement Commission ("ELEC") (the administrator of the statute) as to contributions and expenditures made to seek to influence the legislative process. N.J.S.A. 19:44A-8, 16. There is no threshold monetary exemption for political information organizations, as there is for political committees. For the latter, there is a threshold of $100, exclusive of traveling expenses, expended to support or defeat a candidate for election or to aid the passage or defeat of a public question. However ELEC, purporting to act under its rule-making power, has adopted regulations which exempt political information organizations as well as political committees from the reporting and other requirements of the act if their total expenditures are less than $100 (exclusive of unreimbursed traveling expenses of a member) during the applicable calendar years. N.J.A.C. 19:25-12.1(d). Plaintiffs challenged that regulation in respect of political information organizations, and the trial court held it invalid as beyond the legislative delegation. 135 N.J. Super. at 550-551. Defendants appeal from that ruling as well as from the invalidation of the statutory regulations of political information organizations.
The record and arguments in this case fail to disclose any clear conception by plaintiffs or the trial court as to the definition of the groups or organizations thought to be impermissibly chilled in freedom of expression by the statutory regulations. It is readily conceded that plaintiffs themselves, comprising such organizations as the New Jersey Chamber of Commerce, several major trade associations, corporations engaged in lobbying as a profession, and others permanently devoted to influencing legislation, are validly subject to the statutory controls. With apparent approval, the trial court conceived the reporting act as designed "to identify and attempt *223 to regulate the significant flow of substantial wealth aimed at affecting the outcome of elections, public questions and the legislative process." 135 N.J. Super. at 544. But it was satisfied from the proofs before it that "so-called single issue groups or ad hoc committees which spontaneously spring up to voice their special interest on specific bills before the Legislature," id. at 546, would sustain such discouragement from having to comply with the act that the adverse effect on the exercise of their rights to express themselves to the Legislature outweighed the state interest in requiring compliance. While the court contrasted the effect of the act on "the well-organized lobbyist-type groups," ibid., there was no suggestion as how the line could properly be drawn by the Legislature or by a court between groups constitutionally regulable and those not. Upon inquiry by this court on the subject at oral argument, plaintiffs suggested that the constitutionally controllable groups would be only those who were permanent in nature and organized to protect business interests.
Brief reflection suffices to reject the concept that "single issue-ad hoc" is the appropriate characterizing criterion. Common experience indicates that some single issues, such as school busing, quotas for minorities, public aid to indigents for abortion, etc., can inspire the spontaneous rise of powerful groups. Yet such groups may fade away when a campaign for or against a piece of legislation is over. It cannot reasonably be contended that such groups would not be legitimately subject to the compelling state interest in publicizing contributions and expenditures to influence legislation, notwithstanding their "single-issue-ad hoc" character. See II, hereinafter.
After searching thought on the matter we have concluded, for reasons which will appear hereinafter, that the only significant and practicable criterion for the purpose under discussion is a reasonable financial threshold for expenditures of such groups or organizations.

*224 I
Defendant-intervenor Common Cause argues that plaintiffs' cause of action should be barred for failure to prove injury by the statute. Plaintiffs admit that they are not injured, but they claim the right to advance the claim of overbreadth of the statute in respect of its effect on the First Amendment rights of others, the so-called single issue-ad hoc groups, who they assert are injured. Anderson v. Sills, 56 N.J. 210, 220 (1970); Broadrick v. Oklahoma, 413 U.S. 601, 611-612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Defendant argues that the claimed inimical effect on the rights of the small groups is not shown to rest on more than speculation or surmise, citing Anderson v. Sills, supra, where the injury asserted by the plaintiffs was described by the court as "a mere abstraction." 56 N.J. at 226. See also Bigelow v. Virginia, 421 U.S. 809, 817, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972) (requiring more than "allegations of a subjective `chill,'" i.e., "a claim of specific present objective harm or a threat of specific future harm"; and California Bankers v. Shultz, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974).
Plaintiffs' proofs in this regard at the trial were that over any period of time there arise a multitude of small, informal and generally temporary groups, seeking to influence specific legislation, which keep no books, records or regular bank accounts. Some of plaintiffs' witnesses, present or former legislators, expressed the opinion that upon learning that the statute applied to them, members of such groups would be inhibited or discouraged from such activity. It seems obvious that the extent of such discouragement is not calculable in advance of some experience under the act. Much would depend upon the enforcement policies of ELEC, and the position manifested by that body in this case and previously, especially its promulgation of the $100 threshold, *225 would not seem to portend application of the statute and its penalties to most of the kinds of small groups which give the plaintiffs concern. In such a climate of uncertainty as to the practical effect of cognate legislation on First Amendment rights, there has been a tendency not to hold such legislation facially invalid, but to await specific complaints and particularized proofs by disaffected individuals and groups. See Buckley v. Valeo, 424 U.S. 1, 68-71, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); United States v. Harriss, 347 U.S. 612, 626, 74 S.Ct. 808, 98 L.Ed. 989 (1954). See Leventhal, "Courts and Political Thickets," 77 Colum. L. Rev. 345, 376 (1977).
We do not propose to weigh this closely disputed issue of degree of harm in the context of the present case. The evidence warrants a finding of a cognizable measure of harm to protectable interests. However, for reasons to appear, we have concluded that the strong, compelling public concern in preserving the statutory disclosure by those public information organizations which are concededly constitutionally regulable calls for such judicial interpretation or surgery of the statute as will at the same time protect the constitutional rights of the small vulnerable groups properly of concern to the trial court.

II
This case presents another in the classic series of conflicts in recent years to have engaged the courts between statutory policies thought to be supported by compelling governmental interests and claimed encroachments upon rights of expression. In the balancing process exercised by the courts to resolve the issue, the cogency of the governmental interest served by the encroaching regulation is a paramount consideration.
No one in this case deprecates the important public interests served by reasonable legislative requirements of public disclosure of receipts and expenditures in the twin areas of elections and lobbying.
*226 In the recent decision in Buckley v. Valeo, supra, the court dealt with the constitutionality of a number of provisions of the Federal Election Campaign Act of 1971, upholding some and striking down others. In upholding, generally, the public disclosure provisions of the statute, the court preliminarily conceded that "exacting scrutiny" of the governmental interest served was necessary in "compelled disclosure" situations because serious infringement on privacy of association and other First Amendment values can result, citing NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). 424 U.S. at 64, 96 S.Ct. 612. The court then went on to say:
* * * But we have acknowledged that there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the `free functioning of our national institutions' is involved. Communist Party v. Subversive Activities Control Bd., 367 U.S. 1, 97, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).
The governmental interests sought to be vindicated by the disclosure requirements are of this magnitude. They fall into three categories. First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.
Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return. And, as we recognized in Burroughs v. United States, 290 U.S. [534], at 548, 54 S.Ct. 287, 78 L.Ed. 484, Congress could reasonably conclude that full disclosure during an election campaign tends `to prevent the corrupt use of money to affect elections.' In enacting these requirements it may have been mindful of Mr. Justice Brandeis' advice:
"Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."
*227 Third, and not least significant, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above. [at 66-68, 96 S.Ct. at 657.]
More directly pertinent to the case at hand is the decision in United States v. Harriss, supra (347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989) which sustained the disclosure provisions of the Federal Lobbying Act, 2 U.S.C.A. § 261 et seq. Challenge to those provisions on the grounds of vagueness was brought by a trade association and individuals engaged in lobbying activity who were charged by information with criminal violation of the reporting provisions. In an opinion by Chief Justice Warren, the court construed the statutory provisions as applicable only to persons who solicited, collected or received contributions, where one of the main purposes of the person or contribution was to influence the passage or defeat of congressional legislation, and the intended mode of influence was through direct communication with members of Congress. 347 U.S. at 623, 74 S.Ct. 808. That construction consisted of clarification of ambiguous terms; the court did not substitute its own language for the statutory language. See 347 U.S. at 618-623, 74 S.Ct. 808. So construed, the Court held that the statute would "not violate the freedoms guaranteed by the First Amendment  freedom to speak, publish, and petition the Government." 347 U.S. at 625, 74 S.Ct. at 815. Justification for the requirements was found in the legislators' need to know by whom they were being influenced. The court stated:
Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent. [at 625, 74 S.Ct. at 816.]
*228 The observations of the court in Harriss by no means exhaust the facets of public policy subserved by a requirement of public reporting in respect of activity designed to influence legislation. In Fritz v. Gorton, 83 Wash.2d 275, 517 P.2d 911 (Sup. Ct. 1974), in sustaining lobbying reporting legislation against a claim of overbreadth in relation to First Amendment rights, the court said:
The electorate, we believe, has the right to know of the sources and magnitude of financial and persuasional influences upon government. The voting public should be able to evaluate the performance of their elected officials in terms of representation of the electors' interest in contradistinction to those interests represented by lobbyists. Public information and the disclosure required by section 24, [elected officials' reports of financial affairs], coupled with that required of lobbyists and their employers may provide the electorate with a heretofore unavailable perspective regarding the role that money and financial influence play in government decision making and other functions performed by public officials. [517 P.2d at 931]
See also Young Americans for Freedom, Inc. v. Gorton, 83 Wash.2d 728, 522 P.2d 189, 191 (Sup. Ct. 1974).
It is in the light of these compelling state interests in requiring disclosure as to lobbying receipts and expenditures that we must appraise the trial court's decision that this was an appropriate case for facial invalidation of the provisions in entirety because of feared chilling of the exercise of rights of expression by some small groups. The recent tendency of courts, here as well as elsewhere, when legislation generally serving a proper public purpose is found to contain the potential of infringement of constitutional rights, is decidedly against facial invalidation of the entirety of the legislation and in favor of judicial construction or judicial surgery to narrow or expand the effect of the act so as to erase the unconstitutional aspect. Collingswood v. Ringgold, 66 N.J. 350, 357-358 (1975), app. dism. 426 U.S. 901, 96 S.Ct. 2220, 48 L.Ed.2d 826 (1976); State v. De Santis, 65 N.J. 462, 472-473 (1974); Camarco v. Orange, 61 N.J. 463, 466 (1972); State v. Profaci, 56 N.J. 346, *229 349-350 (1970); Schmoll v. Creecy, 54 N.J. 194 (1969); Broadrick v. Oklahoma, supra (413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830); C.S.C. v. Letter Carriers, 413 U.S. 548, 577-579, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); cf. State v. Zarinsky, 75 N.J. 101 (1977).
The federal approach in this area has been comprehensively restated by the United States Supreme Court in Broadrick v. Oklahoma, supra, which sustained as constitutional an Oklahoma statute prohibiting certain kinds of political activities by state employees. The court explained that it had previously upheld claims of facial overbreadth in state statutes which sought to regulate only "spoken words." 413 U.S. at 612, 93 S.Ct. 2908. In such cases "any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." Id. at 613, 93 S.Ct. at 2916. And, with particular pertinence to the instant problem, the court said (ibid.):
* * * Application of the overbreadth doctrine in this manner is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute.
Moreover, said the court, the function of overbreadth adjudication in the First Amendment area "attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from `pure speech' toward conduct and that conduct  even if expressive  falls within the scope of otherwise valid criminal laws that reflect legitimate State interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." 413 U.S. at 615, 93 S.Ct. at 2917.
The significance of the foregoing observations in relation to the present case has several aspects. First, while the reporting act regulates "conduct" which is "expressive," it nevertheless *230 involves the collection and disbursement of money to influence legislation  conduct of a potentially baleful effect which is within the ambit of legitimate state control. Second, the device of facial condemnation of statutes is one to be used in only narrow and exceptional circumstances. Third, and most significant, the potentially deleterious effect of the reporting act at bar is readily susceptible of cure without facial invalidation, by judicial excision from the scope of the act of such lobbying groups as are under a stated minimum of annual expenditures.
The practice of judicial surgery or engrafting of legislation to save it from unconstitutionality when the court reasonably believes the Legislature would so choose if faced with the choice between extinction of the statute and the proposed judicial modification has been extensive in this State over the years. See the cases cited at 228-229, supra. As put by Chief Justice Weintraub in Schmoll v. Creecy, supra,
* * * [T]he question is whether the Legislature would want the statute to survive, and that inquiry cannot turn simply upon whether the statute, if adjusted to the constitutional demand, will cover more or less than its terms purport to cover. Although cases may be found which seem to speak in such mechanical terms, we think the sounder course is to consider what is involved and to decide from the sense of the situation whether the Legislature would want the statute to succumb. [54 N.J. at 202]
In application to the case at hand judicial modification is clearly warranted. The trial court recognized that the intent of the statute was, as noted above, "to regulate the significant flow of substantial wealth aimed at affecting * * * the legislative process." Excision from the statute of groups not capable of such "flow of substantial wealth" would not offend the legislative purpose.
In view of the settled policy of our highest court to save the constitutionality of statutes where feasible under the practice discussed above, it was error for the trial court expressly to refuse to do so and to decree the demise of the highly salutary and compellingly important disclosure provisions *231 of the statute under the rubric of facial invalidity. 135 N.J. Super. at 551.

III
We have accepted the factual finding of the trial court that the terms of the reporting act, if literally applied and enforced, would exert a substantially chilling effect on some groups who collect or spend small sums of money to influence legislation in limited contexts. Although, as noted above, ELEC has by regulation adopted a threshold annual limitation of $100 for political information organizations (and see IV hereinafter), we regard that sum as too small, in the light of current inflated costs, to provide adequate protection to the groups referred to.
It has been brought to our attention that the Legislature has recently passed a bill (Assembly 3140) amending the reporting act to fix a $750 threshold for annual expenditures for the purpose of influencing legislation below which a political information organization is not subject to the requirements of the reporting act in that year. Although this bill has not yet been acted upon by the Governor, its passage in the Legislature during the pendency of this litigation seems to us a reliable judgment by that experienced body as to a monetary limitation which would, by and large, preserve the constitutional rights in freedom of expression of groups whose activities do not substantially affect the public policy underlying the reporting act. We concur in that judgment, and we adopt that limitation in the exercise of our unquestionable power to modify the statutory provisions to this modest extent in order to save their validity in application to all other political information organizations. The pertinent provisions will hereafter be so construed and applied.[2]
*232 The Legislature is of course free hereafter to deal with this subject in any other way which does not substantially dilute the protection by this decision of small groups' First Amendment rights.

IV
Defendants have appealed the action of ELEC in fixing by rule a $100 exemption threshold for annual expenditures by political information organizations. In the light of our determination in III, supra, this question becomes moot.
Judgment reversed. No costs.
NOTES
[1] Although the judgment of the trial court invalidated the statutory provisions as to "political committees" as well as to political information organizations, the holding as to the former was not sought by plaintiffs and is not defended by them on this appeal. In the light of the limited issues litigated, the inclusion of political committees in the determination was improper and is set aside.
[2] ELEC may adopt suitable regulations implementing or supplementing this decision.