**NEW JERSEY–PHILADELPHIA PRESBYTERY OF the BIBLE PRESBYTERIAN CHURCH; Shelton College, a Ministry of Bible Presbyterian Church; Bible Presbyterian Church of Collingswood, New Jersey; Kevin Wilson, Brad Gsel, Kevin Clair Michael, Curtis Jordan Bashaw, Louise Olson and Everette Charles Olson, Plaintiffs,**

v.

**NEW JERSEY STATE BOARD OF HIGHER EDUCATION; T. Edward Hollander, Chancellor of New Jersey Department of Higher Education; Richard D. Breslin, Assistant Chancellor for Academic Affairs of the New Jersey Department of Higher Education, and Amorita Suarez, Director of the Office for Independent Colleges and Universities of the New Jersey Department of Higher Education, Defendants.**

Civ. A. No. 79–3341.

United States District Court,
D. New Jersey.

May 18, 1981.

---

William B. Ball, Philip J. Murren, Kathleen A. O'Malley, Ball & Skelly, Harrisburg, Pa., C. Clark Hodgson, Jr., Stradley, Ronon, Stevens & Young, Esquires, Philadelphia, Pa., Keith J. Bashaw, Bashaw & Burro, P.C., Haddonfield, N. J., for plaintiffs.

James R. Zazzali, Atty. Gen. of N. J., Robert A. Fagella, Deputy Atty. Gen., Trenton, N. J., for defendants.

## OPINION

DEBEVOISE, District Judge.

This is an application by plaintiffs for a temporary restraining order and preliminary injunction.

### Procedural History

An understanding of the procedural history of this case and its related state court case is necessary in order to address the merits of plaintiffs' application.

On November 15, 1979 the New Jersey State Board of Higher Education and T. Edward Hollander, Chancellor of the New Jersey Department of Higher Education, instituted an action in the Superior Court of New Jersey, Chancery Division, naming as defendants The Board of Directors of Shelton College and Glenn Rogers and Carl McIntire, two officers of the College. The complaint sought declaratory and injunctive relief, alleging that Shelton was offering courses of instruction for credit without the requisite licensing by the State Board. The Superior Court forthwith issued a tempo-

rary restraining order enjoining Shelton's educational and instructional activities.

On November 19, 1979 the plaintiffs in the present case filed in this Court an action under 42 U.S.C. § 1983 alleging, among other things, that the efforts of the State Board to prevent Shelton's educational and instructional activities unless it complied with New Jersey's licensing scheme violated their rights to the free exercise of religion and unduly entangled the State in the affairs of a religious institution. The plaintiffs in the federal court action are Shelton, the New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church (the regional ruling body of the Bible Presbyterian Church), Bible Presbyterian Church of Collingswood, New Jersey, four full-time students at Shelton, two parents of students, and a professor of mathematics and chemistry at Shelton. The defendants in the federal court action are the State Board and several individual state officials charged with the enforcement of the licensing regulations.

The federal plaintiffs sought a preliminary injunction. After an evidentiary hearing I entered an order which, among other things, enjoined the federal defendants from taking or permitting the taking of any action having the effect of preventing Shelton from engaging in any religious, teaching or educational activities, or from publicizing or advertising such activities. I did not reach the principal issue, namely, whether the State Board's licensing procedures, if applicable to Shelton, would constitute a violation of the Religion Clauses of the First Amendment. I abstained as to that issue and stayed the federal proceedings until the state court had an opportunity to determine whether the licensing requirements applied to a religious institution such as Shelton. If they do not, there would be no need to reach the difficult constitutional issue posed in this case, *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

Thereafter, the litigation proceeded on two fronts. Both sides appealed this Court's interlocutory order, which both granted and denied injunctive relief, to the Court of Appeals for the Third Circuit. The state court action went to trial.

On November 7, 1980 the state court rendered its opinion. The opinion held: (i) subjecting Shelton to the New Jersey licensing and approval scheme is "not violative of the free exercise clause and provide[s] for minimal and non-excessive entanglement between church and state" and (ii) Shelton's rights of free speech, guaranteed under the First and Fourteenth Amendments of the Constitution, would be impaired if the court denied Shelton the right to call itself a "College", notwithstanding the prohibitory language of N.J.S.A. 18A:67–2.

The state court issued a permanent injunction on December 10, 1980. It prohibited Shelton from awarding a degree "for any coursework or course of instruction which has transpired in whole or in part at Shelton College in the State of New Jersey"; it declared that Shelton must obtain a license from the State Board before it awards any collegiate degrees in New Jersey; it required that Shelton delete all references in its publications which state that Shelton will award collegiate degrees until it is licensed by the State Board; and it ordered that Shelton "shall cause to be inserted in all applications for admission to Shelton College a statement that, pursuant to the order of this Court, said institution is prohibited from awarding baccalaureate or collegiate degrees for coursework which takes place in whole or in part in the State of New Jersey, unless or until a license is issued to defendants by the New Jersey State Board of Higher Education".

On January 16, 1981, Shelton and the other state court defendants noticed an appeal to the Appellate Division of the Superior Court of New Jersey. That appeal is pending.

On April 14, 1981 the Court of Appeals for the Third Circuit filed its opinion, Docket Nos. 80–1253, 80–1254 and 80–2703. The majority opinion held that *Younger* abstention, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), is inappli-

cable in this case by reason of the presence of plaintiffs in the federal action who were not parties to the state action. Thus, this Court's limited injunctive relief was proper. The Court of Appeals upheld a *Pullman* abstention on the constitutional issue and the entry of a *Pullman*-type stay "with a retention of jurisdiction to consider further injunctive relief when the state court construes the statute and regulations". Slip Op., 38. In affirming this Court's exercise of its discretion to abstain under the *Pullman* doctrine, the Court of Appeals noted, perhaps pointedly, that "the district court did not leave the plaintiffs entirely unprotected. It reserved jurisdiction to consider further applications for interim relief." Slip Op., 38–40.

The federal plaintiffs now seek such interim relief. It is their contention that the state court has interpreted New Jersey's college licensing statutes in a manner which violates their First Amendment religious rights, that the injunctive order implementing this determination of the state court will, unless set aside, cause the demise of Shelton College, a religious institution, and that if the federal plaintiffs are required to wait until the state action proceeds through the Appellate Division of the New Jersey Superior Court, the New Jersey Supreme Court and perhaps the United States Supreme Court, ultimate success would be hollow indeed, as the religious institution they sought to preserve would long have been interred.

The federal plaintiffs now seek a temporary restraint and a preliminary injunction restraining the federal defendants from enforcing or implementing the state court's order of December 10, 1980 until such time as the Supreme Court of New Jersey definitively construes the applicable New Jersey statutes and regulations.

### Findings of Facts

I incorporate herein the findings of fact which are set forth in my original opinion, 482 F.Supp. 968 (D.N.J.1980). I do not believe that they are in dispute. It was established that Shelton is a religious institution and that its students, faculty and parents regard it as a vehicle to further their all-pervasive religious beliefs and practices.

Additional facts have been established by affidavits and testimony introduced in support of the federal plaintiffs' present application.

During the pendency of these actions in the state and federal courts Shelton has been unable to grant degrees to students who have completed the academic requirements of the College. The disclaimer which Shelton is required under the state court order to insert in all its publications and on all application forms sent to prospective students has a highly destructive impact upon everything else which appears in those publications. There is nothing to suggest that the publications do not truthfully describe the kind of education which Shelton offers and the religious orientation of every phase of its program. There is nothing to suggest that, absent the state mandated material, any prospective parent or student would be misled in any way about Shelton's educational program.

After attempting to operate in Florida for a period of approximately eight years, Shelton returned to its Cape May campus in the summer of 1979. During the 1979–80 school year it began operations with 28 students. This increased to only 41 to 35 students in the 1980–81 school year. Moreover, as of the present time it has only six applicants for its fall, 1981 freshman class, none of whom have yet been determined to be qualified for admission. It is reasonable to conclude that in part, at least, the College's enrollment has been adversely affected by the inhibitions imposed upon it by the State.

Shelton has experienced a steady drop in the amount of contributions it receives from the public since the time of the institution of the state court action. The pending state litigation, the inability of the College to grant its degrees, the disclaimer the College is required to issue and resulting adverse publicity have resulted in loss of confidence in the ability of the College to survive.

It is impossible to determine whether Shelton would survive if the State injunction were lifted; however, there is little question but that Shelton cannot long exist if the state court injunction remains in effect.

In addition to Shelton's future prospects, its present students have been affected by the state court injunction. At the graduation in May, 1980, four students who had completed four years of study at Shelton in Florida and New Jersey were denied their degrees. Shelton's annual commencement exercise is scheduled for May 23, 1981. On that date eight students who have successfully completed four years of study at the College and who have been determined by the College to possess the religious and moral qualifications requisite for graduation will be eligible to be awarded Shelton's Bachelor of Arts in Biblical Literature, Elementary Education, History or English. By reason of the court decree, of course, these indicia of their work at Shelton cannot be conferred upon them.

The question must now be answered whether the federal plaintiffs are entitled to the relief they seek.

### Conclusions of Law

First I shall direct myself to the grounds which the federal defendants (whom I shall hereinafter refer to as the "State Board") advance as comity reasons why the application should not be granted.

Once again the State Board urges that *Younger* abstention is called for. This argument has been disposed of by the Court of Appeals. There the majority opinion concluded that *Younger* is not applicable at all because the parties in the federal action are substantially different from the parties in the state action. The minority opinion concluded that *Younger* is applicable but that a *Younger*-based exception supported the limited injunctive relief previously granted in this Court. If the federal plaintiffs are correct in their view that New Jersey may not constitutionally apply its licensing requirement to Shelton, I conclude that the same *Younger*-based exception

would be applicable to the present application.

The State Board also urges that the federal plaintiffs have fully litigated both their state claims and their federal claims in the state court, and that, having lost there on all claims, they cannot come back to the federal court for a second bite at the apple.

It is unnecessary to decide whether Shelton took the steps required in the case of a *Pullman* abstention to reserve its rights in the state court litigation to have its federal claims heard by the federal court, see *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). Quite likely the reasoning of the Court of Appeals majority opinion would lead to the conclusion that reservation or non-reservation of federal rights by the state court defendants would not affect the rights to a federal forum of the federal plaintiffs who are not parties to the state court action. In any event, this is a question which will not arise until the state court proceedings have been completed through final appeal, and then only if there still remains a federal question.

We are not at that stage now. We are dealing simply with an application for interim relief pending completion of the state proceedings. The Court of Appeals specifically recognized that such relief might be required and, if so, that it could appropriately be granted, Slip Op., 39–40.

■ The criteria to be applied in determining whether a preliminary injunction should issue are spelled out in the Court of Appeals opinion:

> . . . Once the court has concluded that an immediate dismissal on *Younger* grounds is inappropriate, a motion for preliminary injunctive relief, especially in first amendment contexts, ought, we think, to be considered without regard to the separate question whether a *Pullman* stay of final hearing is appropriate. Assuming the case is not to be dismissed outright, the district court should be guided by the classic requirements for a preliminary injunction:

The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits.

Slip Op., 39.

The federal plaintiffs have established that they will suffer irreparable injury if the state court injunction continues in effect. It will result in the destruction of a religious educational community. At the time I issued the preliminary injunction now in effect, I had thought that this result could be avoided if Shelton were allowed to teach and advertise. It now appears that this is not enough and that if Shelton is to survive it must be able to award degrees to those who successfully complete its courses of instruction.

The major issue to be resolved is whether the federal plaintiffs are likely to prevail on the merits. The core question, therefore, is whether the State Board's exercise of licensing jurisdiction over a religious college such as Shelton "constitutes an improper breaching of the separation wall provided by the Religion Clauses of the First Amendment". *Catholic Bishop of Chicago v. N.L. R.B.*, 559 F.2d 1112, 1118 (7th Cir. 1977), *aff'd*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).

■ I have read with care the thoughtful opinion of the state court and fully recognize my own fallibility, of which the Court of Appeals all too frequently reminds me. Had I been required to reach the merits of this issue at the time I issued the preliminary injunction I think I would have decided the question in exactly the same way the state court decided it. However, with the benefit of the Court of Appeals opinion, which was not available to the state court, I have considered the matter further and, for the reasons set forth below, I have concluded that the State Board may not, consistent with the First and Fourteenth Amendments, apply the State's licensing statutes and regulations to Shelton College and that, therefore, the federal plaintiffs are likely to prevail on the merits.

We start, of course, with the First Amendment to the United States Constitution, which reads, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..." This is made applicable to the states by the Fourteenth Amendment. *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946).

■ While the licensing of religious colleges and the regulation which that entails might be considered involvement by the state in the establishment of religion, the present case involves primarily a state prohibiting the free exercise of religion. Deciding whether this interference with the free exercise of religion is permissible entails the three-step inquiry utilized in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *see also McCormick v. Hirsch*, 460 F.Supp. 1337 (M.D.Pa.1978): (i) It must be determined whether a legitimate religious belief is held by the federal plaintiffs and whether Shelton is pervasively religious. (ii) It must be determined whether the free exercise rights of the federal plaintiffs would be either burdened or inhibited by the exercise of the State Board's regulatory powers over Shelton College. (iii) It must be determined whether the burdening of these rights is justified by a compelling state interest.

As to the first inquiry, it is beyond dispute that the individual federal plaintiffs and the members of the Bible Presbyterian Church and similar fundamentalist churches hold legitimate religious beliefs which are reflected in their life style and teaching. This is described in some detail both in my original opinion and in the opinion of the Court of Appeals.

Similarly, it is beyond dispute that Shelton College plays a major role in the religious life of the members of the Bible Presbyterian Church. As was the case with Amish educational practices which were the

subject of *Yoder*, Shelton provides its students and faculty a "way of life in a church-oriented community, separated from the outside world and 'worldly' influences". 406 U.S. at 217, 92 S.Ct. at 1534. As in the case of parochial schools, which were the subject of such cases as *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), and *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), Shelton's "very purpose . . . is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious value and belief . . . '[T]he secular education these schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence' ". *Meek v. Pittenger, supra,* at 366, 95 S.Ct. at 1763. Although the line of cases typified by *Meek* and *Lemon* involve aid to religious schools, the same standards apply when state restrictions upon religious schools are involved, *Catholic Bishop of Chicago v. N.L.R.B., supra.*

In addition to providing a community where persons of a defined religious group can live, learn and teach in accordance with their tenets, Shelton is a source of the church's clergy and lay leaders. It feeds students to the church's seminary, and its students who do not become ordained ministers are likely to work on behalf of the church in other capacities.

Shelton's pervasively religious nature is described in further detail in my original opinion.

Thus, the federal plaintiffs meet the first test. They and their co-religionists hold legitimate religious beliefs and their college, Shelton, is pervasively religious.

As to the second test, it is clear, in light of the evidence submitted at the original hearing and at the most recent hearing, that the exercise of the federal plaintiffs' religion would be and is burdened by application of the State's licensing requirements. The New Jersey regulatory scheme (N.J. S.A. 18A:68-1, *et seq.*; N.J.A.C. 9:1-1.1 to 9:1-6.4) is described in some detail in the Third Circuit opinion, Slip Op., 8-13. The State Board's "Guide for Obtaining the Basic Information for Appraising New Jersey Institutions of Higher Education" is set forth in an appendix to that opinion. An examination of the Guide demonstrates the intrusive nature of the State Board's inquiry into a college which it seeks to "appraise" and license. The Court of Appeals observed that "[t]he regulations are, in a word, pervasive". It noted that of particular relevance to a religiously affiliated institution is the regulation dealing with the required statement of institutional purpose:

The requirement of a statement of purpose is not merely informational, for the regulation dealing with educational programs provides that '[t]he educational program shall reflect and support the purposes of the institution' and 'shall include course work and other activities extending over a sufficient period of time and in sufficient intensity to fulfill the purposes of the ·institution.' N.J.A.C. 9:1-1.5(a)1, 2. Thus on the face of the regulations it would appear that in order to obtain a license, an institution with a religious commitment such as Shelton's must submit to the Board a statement of its religious purpose, as well as evidence that the various elements of its institutional life are structured to support that purpose, and must submit to the Board's judgment the question whether its educational program reflects and supports that purpose. Facially, therefore, the Board's licensing regulations suggest a very high degree of state entanglement in Shelton's religious affairs. And the 1916 law unambiguously prohibits instruction leading to a diploma or degree, even in theology, absent a license.[8]

[8] *Cf. NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502-03, [99 S.Ct. 1313, 1320-21, 59 L.Ed.2d 533] (1979) (NLRB jurisdiction over alleged unfair labor practices in Catholic religious schools would result in impermissible entanglement, for the Board's resolution of unfair labor practices charges 'will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission.' Moreover, NLRB determination of the 'terms and conditions of employment' would enmesh the Board in 'nearly everything that goes on in the schools.').

Slip Op., 12, 13.

Apart from the subject matter covered by the regulatory scheme, compliance with its requirements imposes heavy burdens. The typical college could be expected to have on its staff the accountants, business managers and other technical personnel required to develop and present the information called for by the State Board's regulations. Shelton obviously does not have these resources. The New Jersey courts have recognized in analogous circumstances that a regulatory scheme cannot withstand a constitutional challenge when it exerts a substantially chilling effect upon the exercise of First Amendment rights of persons whose resources are so modest that they cannot reasonably be expected to comply with the regulations, *N. J. St. Chamber of Commerce v. N.J. Elec. Law*, 155 N.J.Super. 218, 382 A.2d 670 (App.Div.1977).

■ As phrased by the United States Supreme Court, "[e]ach value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to or interfere with religious beliefs and practices *or have the effect of doing so*". *Walz v. Tax Commission, supra*, 397 U.S. 669, 90 S.Ct. 1411 (emphasis added).

Clearly, application of the State licensing regulations to Shelton has the effect of interfering with the religious beliefs and practices of members of the Bible Presbyterian Church and other similar fundamentalist churches. If Shelton could survive under such regulation and sought to comply therewith, the State would intrude pervasively into matters of religious faith and practice. As matters stand, it appears that Shelton cannot survive at all if New Jersey's licensing statutes and regulations are applied to it. In either event substantial religious rights are affected. It is not an answer to assert that Bible Presbyterians are not *required* to attend Shelton. Catholics are not *required* to attend parochial schools. In each case, however, attendance is a means of strengthening, teaching and propagating a religious faith, and, in consequence, the institution is protected from undue state interference.

As an embellishment to the State regulatory scheme, and as a means to insure compliance with it, the state court has required that all Shelton informational material and applications contain a statement that Shelton is prohibited from awarding baccalaureate or collegiate degrees for coursework in New Jersey unless or until a license is issued to Shelton by the State Board. This order was entered apparently with no proof that the state defendants (Shelton, et al.) were misrepresenting their degree-giving capabilities or any other matters. It clearly imposed an additional burden on the ability of Shelton to operate and thus on the exercise of religious rights.

■ "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). Standing alone, this aspect of the state court's order raises serious constitutional questions. Viewed in conjunction with the regulatory scheme it seeks to enforce, it adds significantly to the burdens imposed upon the free exercise of religion.

Having concluded that the licensing scheme imposes a substantial burden upon the exercise of religion, it must be determined if this burdening of rights is justified by a compelling state interest.

The interest of the State involved in the licensing scheme is a significant and totally legitimate one—maintaining the integrity of the various degrees traditionally awarded by colleges by insuring compliance with minimum standards in the educational process leading to the award of a degree, *Shelton College v. State Bd. of Ed.*, 48 N.J. 501, 226 A.2d 612 (1976).

Important as this interest may be, however, it cannot be used as a basis to impose substantial burdens upon the exercise of religion. The weighing process is guided by an examination of *Wisconsin v. Yoder, supra*. There the state's interest was a very substantial one—the proper education of young children, a process which is so important the state makes such education compulsory. Notwithstanding that vital state

interest, the Supreme Court did not permit it to interfere with the religious practices of the Old Order Amish.

In the present case, the interest of New Jersey in the integrity of the traditional college degree is far less substantial than the interest of Wisconsin in the quality of education of secondary school students.

Illustrative of the lesser significance of this interest is the fact that New Jersey does not require that all colleges be licensed by the State Board before they are allowed to confer degrees. As noted in the State's own regulations:

> The current status of New Jersey independent institutions of higher education with respect to degree approvals varies widely. At one extreme are the so-called pre-1887 institutions which are not required to secure the approval of the Board of Higher Education at all. At the other are some of the more recently founded institutions which have been granted approvals under conditions far more detailed than would be required by the policy set forth in this Subchapter. In between these extremes are other institutions—Upsala and the College of Saint Elizabeth are examples—which were granted broad powers by the State Board of Education following passage of the Acts of 1912 and 1916.

N.J.A.C. 9:1–2.15 (footnote omitted).

The institutions which are not required to secure State Board approval are Drew University, Seton Hall University, St. Peter's College, St. Michael's Monastery, Stevens Institute of Technology, Princeton University and Centenary College for Women. Theoretically, any one of those colleges could adopt Shelton's educational program or any other program and their degree-awarding powers would be unaffected by the State Board's licensing regulations.

Further, Shelton has not been charged with fraud or misleading conduct. There has been no showing that any prospective students or parents of such students were or would be misled if Shelton were to award degrees for completion of its courses of study. Shelton's informational material is in the record and it clearly describes the kind of college Shelton is, the subject matter taught, and the all-pervasive religious perspective of the College.

Nor has it been shown that prospective employers of Shelton graduates or graduate schools to which Shelton students may apply will be misled by the award of Shelton degrees. It is common knowledge that all manner of institutions give all manner of degrees, having varying prestige and significance. In evaluating the significance of those degrees employers and graduate schools look to the institutions which awarded the degrees, and they look to the public and private agencies which accredited such institutions. When appropriate, graduation from an accredited college or university is made the basis for qualification, see, for example, N.J. Court Rule 1:24–2(b) for the requirement for admission to the New Jersey bar examination of receipt of a degree from a law school approved by the American Bar Association.

Cases in this Court seeking the protection of the religious rights of state prisoners have disclosed the existence of small institutions of learning organized by the Black Muslim sect which award doctorate or other degrees. In at least one of these cases the Attorney General of New Jersey represented the State. These degrees are awarded without the imprimatur of the State Board; the members of the sect thereby have available to them a minister or imam or other officer who has received a degree whereby his sect certifies that he has successfully pursued a course of study prescribed by that sect; see, for example, *Malik Abdul Alim v. Brendan T. Byrne*, Docket Nos. 76–0499, 76–1661 (Unpublished Opinion filed July 8, 1980) (plaintiff's appeal pending).

Degrees have varying meanings and uses. As evidenced by N.J.A.C. 9:1–2.15, New Jersey requires some traditional colleges and universities to obtain state licenses before awarding a degree and it allows other traditional colleges and universities to award degrees without any state regulation whatsoever. It does not appear that the state makes any effort to regulate the granting of degrees by agencies of unconventional religious sects such as the Black

Muslims. In the light of these facts it cannot be said that the state's interest in the integrity of degrees granted in New Jersey is so overwhelming that the religious rights of the Bible Presbyterians can be substantially impaired. Nor is the state's interest so overwhelming that it may, through the licensing process, entangle itself to a high degree in the religious activities of a wholly religious college.

The injunction of the state court enforces the application of the licensing statute and regulations against Shelton College. Since I have concluded that the federal plaintiffs are likely to prevail on the merits and that the application of the licensing statute and regulations against Shelton College is causing and will continue to cause them irreparable injury, the defendants in this case will be preliminarily enjoined from enforcing or implementing the order of December 10, 1980 of the Chancery Division of the New Jersey Superior Court until such time as the Supreme Court of New Jersey construes the New Jersey statutes and regulations which are the subject of this action.